Nicolas Leandro **MARTINEZ, Individually, and as Independent Administrator of the Estate of Margaret Gloria Martinez, Deceased; Christina Marie Ortiz; Carmen Rachel Ortiz; and Miguel Antonio Ortiz**

v.

**Cesar H. PORTA, M.D.; Ramasamy Selvaraj, M.D.; Scott Williamson, M.D.; and United Regional Health Care System, Inc., d/b/a United Regional Health Care System.**

Action No. 4:03–CV–915–Y.

United States District Court,
N.D. Texas,
Fort Worth Division.

Feb. 19, 2009.

H. Dustin Fillmore, III, Charles W. Fillmore, Fillmore Law Firm, Fort Worth, TX, for Nicolas Leandro Martinez, Christina Marie Ortiz, Carmen Rachel Ortiz, Miguel Antonio Ortiz.

Jennifer M. Andrews, Wallach & Andrews PC, Fort Worth, TX, for Cesar H. Porta.

Randy J. Hall, Decker Jones McMackin McClane Hall & Bates, Fort Worth, TX, for Cesar H. Porta, Ramasamy Selvaraj.

Susan E. Baird, Cotten Schmidt, Fort Worth, TX, for Scott Williamson.

Carol D. Williamson, Joseph A. Turano, Brian G. Hamilton, Strasburger & Price, Dallas, TX, for United Regional Health Care System, Inc.

*ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDG- MENT, DENYING PLAINTIFFS' MOTION FOR PARTIAL SUM- MARY JUDGMENT, AND DENY- ING* DAUBERT *CHALLENGES*

TERRY R. MEANS, District Judge.

Pending before the Court are the following four motions filed on October 31, 2008, and a fifth filed on November 6:(1) Plaintiffs' Motion for Partial Summary Judgment and *Daubert* Challenge [doc. # 262]; (2) defendant Ramasamy Selvaraj's Motion for Summary Judgment and *Daubert* Challenge [doc. # 266]; (3) defendant United Regional Health Care System, Inc.'s Motion for Summary Judgment [doc. # 268]; (4) defendant Cesar H. Porta's Motion for Summary Judgment and *Daubert* Challenge [doc. # 272][1]; and (5) defendant Scott Williamson's Motion for Summary Judgment and *Daubert* Challenge [doc. # 292]. After consideration, the Court DENIES the motions and the *Daubert* challenges.

## I. BACKGROUND

Margaret Martinez was forty-eight, obese, a cigarette smoker, and had a family history of coronary artery disease and diabetes; thus, she was at risk for coronary artery disease. (Joint Pretrial Order ("JPO") at 70, 72; Plfs. Summ. J. Resp. App. at 341.) On November 18, 2001, at 5:45 a.m., Martinez arrived at United Regional Health Care System ("URHCS")'s emergency department. During URHCS's initial screening during triage, Martinez reported pain in the middle of her chest that radiated down both arms and her back, right side neck pain, and right-arm numbness, which had been present for twenty-four hours. (URHCS Corrected Summ. J. App. at 144; Joint Pretrial Order at 68, 71.) She was seen first by Selvaraj, who ordered the following tests: a complete blood count, a blood serum chemistry panel, chest x-rays, a computerized tomography scan ("CT") of her chest, cardiac marker tests, and an electrocardiogram ("EKG").[2] (URHCS Corrected Summ. J. App. at 144.) The test results were normal with no indication that Martinez was having a cardiac event. (URHCS Corrected Summ. J. App. at 147– 54.) Martinez's pain was somewhat alleviated by two doses of nitroglycerin spray. Selvaraj concluded that Martinez was suffering from "atypical chest pain" and ordered a second enzyme test to check for abnormal cardiac markers. (URHCS Corrected Summ. J. App. at 145, 236.) Selvaraj also noted that, based on Martinez's elevated blood-sugar level, Martinez had the onset of diabetes.

Around 7:00 a.m., Selvaraj transferred Martinez's care to Porta after a discussion of Martinez's symptoms, history, and treatment. (URHCS Corrected Summ. J. App. at 236.) Porta ordered Demerol for Martinez to treat her continuing pain, which lessened it. (URHCS Corrected Summ. J. App. at 144.) After the second set of cardiac markers were normal, Porta determined that Martinez could be discharged from the emergency department. Martinez was given instructions to have a diagnostic sonogram the next morning to check for possible gallstones. (URHCS Corrected Summ. J. App. at 145.) Martinez was discharged at 8:10 a.m. (URHCS Corrected Summ. J. App. at 146.)

At 9:05 a.m., Martinez returned to the emergency department, complaining of radiating pain in her neck and between her shoulder blades, and was seen again by

---

1. Selvaraj and URHCS have joined in Porta's *Daubert* challenge.

2. This test is also abbreviated "ECG" in URHCS's records. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 606 (3d ed. 2007).

Porta. (URHCS Corrected Summ. J. App. at 125, 128.) Martinez was rocking and crying in pain, and was given more Demerol. (URHCS Corrected Summ. J. App. at 130.) Porta ordered additional x-rays, which came back normal. (URHCS Corrected Summ. J. App. at 151–52.) A second CT scan and EKG were normal as well. (URHCS Corrected Summ. J. App. at 121–23.) Because Martinez's pain continued, Porta contacted Martinez's primary-care physician, Williamson. Williamson, based on Martinez's back, neck, and chest pain, decided to admit Martinez to URHCS at 2:20 p.m. "for pain control and further evaluation." (URHCS Corrected Summ. J. App. at 98, 129.) The admission was for a twenty-three-hour observation. (Plfs. Summ. J. Resp. App. at 662.) Williamson ordered an abdominal ultrasound and prescribed intravenous morphine. (URHCS Corrected Summ. J. App. at 98, 100.)

At 3:00 p.m., Martinez told URHCS staff that she still had pain radiating down her shoulder. (Plfs. Summ. J. Resp. App. at 679.) At 7:30 p.m., Martinez reported "chest tightness that goes from front of chest [through] back." (Plfs.' Summ. J. Resp. App. at 679.) The next morning at 1:15 a.m., Martinez called for a nurse to help her go to the bathroom. Martinez raised up on her elbow and collapsed back into the bed unconscious with no pulse. Although URHCS staff tried to resuscitate Martinez, she was pronounced dead approximately forty-five minutes later. (URHCS Corrected Summ. J. App. at 101.) An autopsy showed that Martinez's death was caused by "hemopericardium[3] with cardiac tamponade[4] due to rupture of acute myocardial infarct[ion] due to is-

chemic heart disease." (URHCS Corrected Summ. J. App. at 134.)

Martinez's husband and children (collectively, "Plaintiffs") filed suit against URHCS for violating the Emergency Medical Treatment and Active Labor Act ("EMTALA") by failing to provide Martinez with an appropriate medical screening and by failing to treat Martinez similarly to other patients with similar symptoms. See 42 U.S.C.A. § 1395dd (West Supp.2008). Plaintiffs also sued Selvaraj, Porta, and Williamson for medical negligence under Texas law. Defendants separately move for summary judgment, and Plaintiffs have filed a motion for partial summary judgment on their EMTALA claim.

## II. EXPERTS' OPINIONS AND *DAUBERT* DISCUSSION

As stated before, an autopsy was performed after Martinez's death by Marc Krouse of the Tarrant County Medical Examiner's Office. Krouse found evidence of ischemic heart disease, which was manifested by major blockages in the arteries supplying oxygenated blood to Martinez's heart. (Porta Summ. J. App. at 27–28.) The muscle area with the highest degree of blockage had a "blow out" or rupture. (Porta Summ. J. App. at 28–29.) The rupture released a large volume of blood around the heart sac, causing a cardiac tamponade and Martinez's death. (Porta Summ. J. App. at 29, 38–39.) Krouse deduced that based on Martinez's approximately three-day period of symptoms and based on a yellow discoloration around the rupture site, Martinez suffered a heart attack two to three days before she died.

---

3. Hemopericardium is a collection of blood in the pericardial cavity, i.e., the sac around the heart. See DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 852.

4. A cardiac tamponade is the acute compression of the heart caused by increased cardiac pressure due to the collection of blood or fluid in the pericardium due to a rupture of the heart. See DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1893.

(Porta Summ. J. App. at 29–30, 32, 35, 37.) Krouse stated that once the rupture occurred, it was highly unlikely Martinez could have been saved. (Porta Summ. J. App. at 35–40.)

Plaintiffs proffer three experts to counter Krouse's conclusions: Richard Hoffman, Carlo Rosen, and Andrew Farb. Hoffman states that Martinez did not suffer a myocardial infarction until after she arrived at the emergency department because her cardiac markers were normal when tested upon her arrival. (Plfs. Summ. J. Resp. App. at 1094–95.) Likewise, Rosen concludes that the myocardial infarction that caused Martinez's death occurred after she arrived at the emergency department. (Porta Summ. J. Mot. at 12.)[5] Farb states that based on the tissue samples from the autopsy, Martinez suffered an acute heart attack that occurred between twelve and twenty-four hours before her death. (Plfs. Summ. J. Resp. App. at 545.) Farb agreed that a yellow discoloration can occur two to three days after an infarction, but asserted that it can manifest closer in time to the infarction. (Porta Summ. J. App. at 49.)

Porta, Selvaraj, Williamson, and URHCS challenge the conclusions of Hoffman, Rosen, and Farb regarding when Martinez suffered her heart attack by asserting they are based on an "analytic gap," which results in a lack of scientific reliability. Plaintiffs assert that Krouse's contradictory opinions are unreliable.[6] *See generally* FED.R.EVID. 702.

■■■■ The experts' methodologies or qualifications have not been challenged. Expert testimony is presumed admissible, and this Court has broad discretion to decide whether to admit or exclude expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Satcher v. Honda Motor Co.,* 52 F.3d 1311, 1317 (5th Cir.1995). Expert testimony is admissible to aid the fact-finder in determining a fact in issue if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. *See* FED.R.EVID. 702. A reliability analysis, which is argued here, ensures that the expert "employs ... the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Normally, questions regarding the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility, which should be left for the fact-finder's consideration. *See Dixon v. Int'l Harvester Co.,* 754 F.2d 573, 580 (5th Cir.1985). Here, each party's argument to exclude the expert opinions of the other side boils down to an assertion that those

---

**5.** The Court cannot locate Rosen's report in the parties' voluminous appendices, and the parties have referred solely to Rosen's August 2008 deposition to support their statements regarding Rosen's medical conclusions. However, the deposition excerpts seem to refer solely to what tests Rosen believes Selvaraj, Porta, and Williamson should have ordered for Martinez and that such failure resulted in her death. Since the parties do not seem to dispute that Rosen's conclusions are similar to Hoffman's and Farb's, the Court will assume that Rosen likewise opined that Martinez suffered a heart attack no earlier than her arrival at the emergency department in November 2001.

**6.** A hearing on this motion is not necessary. The parties have provided sufficient evidence and arguments regarding the disputed portions of the experts' opinions. This court has ample information to decide reliability without a hearing. *See, e.g., Nelson v. Tenn. Gas Pipeline Co.,* 243 F.3d 244, 249 (6th Cir.2001); *United States v. Nichols,* 169 F.3d 1255, 1262–64 (10th Cir.1999).

opinions are unreliable because they are in direct opposition to each other and do not consider the facts the opposing parties believe are important. This type of challenge goes merely to the weight to be accorded such testimony and does not bar admission. Indeed, the arguments raised by the parties in response to the *Daubert* challenges are ripe subjects for cross-examination and show that these experts' opinions contain the indicia of reliability envisioned by *Daubert* and its progeny. The *Daubert* challenges are denied.

## III. EMTALA

### A. PLAINTIFFS' AND URHCS'S ARGUMENTS

Plaintiffs assert that URHCS violated EMTALA by (1) failing to provide to Martinez an appropriate medical screening examination within the capability of its emergency department and (2) discharging Martinez with knowledge that she had an unstable emergency medical condition. (Plfs. Partial Summ. J. Mot. at 2.) URHCS argues that the evidence shows (1) the screening examination provided to Martinez was the same offered to any other patient in a similar condition with similar symptoms and (2) Martinez was discharged because no emergency medical condition had been diagnosed. (URHCS Mot. for Summ. J. at 3–4.) Both Plaintiffs and URHCS move for summary judgment on Plaintiffs' EMTALA claim.

■ EMTALA was enacted to prevent patient "dumping," which is the practice of refusing to treat patients who are unable to pay. *See Marshall v. E. Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir.1998). EMTALA requires that a hospital with an emergency department, like URHCS, (1) must provide an appropriate medical screening, (2) must provide stabilization of a known emergency medical condition, and (3) be restricted on transfer of an unstabilized individual to another medical facility. *See* 42 U.S.C.A. § 1395dd(a)-(c) (West

Supp.2008). In sum, a hospital must appropriately and uniformly screen emergency patients and stabilize those patients with known emergency medical conditions.

■ EMTALA requires that a hospital develop a screening procedure designed to identify such critical conditions that are presented in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints. *See, e.g., Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 879 (4th Cir.1992). This is an individualized standard and is based upon the capabilities of each hospital's emergency department. *See id.* at 879–80. The question is whether a hospital's emergency department's screening process was performed equitably in comparison to its other patients with similar symptoms. *See Marshall*, 134 F.3d at 322. But the question is not whether the screening examination accurately diagnosed the medical condition, which would turn EMTALA into a federal medical malpractice statute. *See id.* Rather, the question is whether the hospital treated Martinez differently from patients with similar symptoms. Plaintiffs have the burden of showing that it did. *See id.* at 323–24.

Regarding stabilization, EMTALA states that if the hospital determines that a patient has an emergency medical condition, it must provide "such further medical examination and such treatment as may be required to stabilize the medical condition." 42 U.S.C.A. § 1395dd(b)(1) (West Supp.2008). The duty to stabilize only arises if the hospital has actual knowledge that the patient has an unstabilized emergency medical condition. *See Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 558 (5th Cir.2000).

### B. CROSS-MOTIONS FOR SUMMARY JUDGMENT AND STANDARD OF REVIEW

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). To determine whether there are any genuine issues of material fact, the Court first must consult the applicable substantive law to ascertain what factual issues are material. *See Lavespere v. Niagara Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir.1990). Next, the Court must review all the evidence on those issues, viewing the facts and inferences therefrom in the light most favorable to the nonmovant. *See id.; Newell v. Oxford Management Inc.*, 912 F.2d 793, 795 (5th Cir.1990); *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir.1989).

The party moving for summary judgment has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party need not produce evidence showing the absence of a genuine issue of material fact with respect to an issue on which the nonmovant bears the burden of proof. Rather, the moving party need only point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmovant's claim. *See id.* at 323–25, 106 S.Ct. 2548.

When the moving party has carried its summary judgment burden, the nonmovant must go beyond the pleadings and by its own affidavits or by the depositions, answers to interrogatories, or admissions on file set forth specific facts showing that there is a genuine issue for trial. *See*

FED.R.CIV.P. 56(e). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075(5th Cir.1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

### C. DISCUSSION

■ Plaintiffs and URHCS are in dispute as to whether Martinez was experiencing chest pain during her first visit to the emergency department. The court finds URHCS's position hard to believe. Throughout this lengthy litigation, URHCS consistently has stated that Martinez experienced chest pain "throughout" both visits to the emergency department. (Plfs. Summ. J. Resp. at 23–26; Plfs. Partial Summ. J. Br. at 18–22.) Nevertheless, this dispute, at its core, is a factual one that this Court cannot solve at this juncture. For the purposes of this order and based on URHCS's previous judicial admissions, the Court will assume that Martinez reported experiencing chest pain during both visits to the emergency department.[7]

### 1. Screening

URHCS had policies in place governing emergency treatment. URHCS's EMTALA policy anticipated that (1) URHCS "will provide an appropriate medical screening examination to determine whether or not an emergency condition exists,[8]" (2) the "medical screening exami-

---

7. Even if Martinez did not report chest pain during her first visit to the emergency department, fact issues exist regarding what testing was required under URHCS's EMTALA policy for the symptoms Martinez did report.

8. An emergency medical condition is defined in the policy as:

[A] medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual ... in serious jeopardy, in serious impairment to bodily func-

nation will utilize ancillary services routinely available to the emergency department," and (3) the appropriate medical screening examination "will be performed by medical personnel determined qualified by hospital by-laws or rules and regulations." (Plfs. Summ. J. Resp. App. at 218.) URHCS's bylaws delegated to "practitioners who render emergency care" the responsibility to "provide the federally mandated initial medical screening examination." (Plfs. Summ. J. Resp. App. at 156; URHCS Corrected Summ. J. App. at 85.) With regard to individuals presenting at the emergency department with an emergency medical condition, the policy required that URHCS "provide ... such medical examination and treatment necessary to stabilize the medical condition." (Plfs. Summ. J. Resp. at 219.)

URHCS created a standard screening exam for chest-pain patients ("the guidelines"), which was applicable to patients with the same or similar symptoms as Martinez. (Plfs. Summ. J. Resp. App. at 182, 993–94.) The guidelines provided for serial cardiac enzyme measurements, serial EKG testing, and cardiology consultation.[9] URHCS asserts that the guidelines were optional and not part of its medical screening examinations under EMTALA. URHCS typically and routinely used cardiac perfusion scans[10] to determine the cause of unexplained chest pain. (Plfs. Summ. J. Resp. App. at 307, 516–17.) Martinez did not receive serial enzyme tests, serial EKGs, a cardiology consultation, or a cardiac perfusion scan. Although URHCS asserts that these tests were not required because the examining

doctor did not consider them necessary in Martinez's case, URHCS misunderstands the EMTALA inquiry. If there was any departure from standard screening procedures, the screening was in violation of EMTALA. *See Gatewood v. Wash. Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991). The doctors' motivations for the departure are irrelevant. *See Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 857–58 (5th Cir.1994).

This case is rife with fact issues precluding summary judgment. Plaintiffs have proffered evidence that Martinez's care might have differed from other patients who presented to the emergency department with chest pain, which precludes summary judgment in URHCS's favor. *See Southard v. United Reg'l Health Care Sys., Inc.,* No. 7:06–CV–011–L, 2008 WL 5049299, at *4 (N.D.Tex. Nov. 26, 2008). Likewise, fact issues regarding what tests were actually required under URHCS's EMTALA procedures keeps this Court from granting Plaintiffs a partial summary judgment.

### 2. Stabilization

Similarly, summary judgment would be improper on Plaintiffs' claim on the stabilization prong of EMTALA regarding Martinez's first visit to the emergency department. Martinez's doctors recognized that Martinez's presentation with radiating chest pain indicated cardiac problems, including unstable angina. (Plfs. Summ. J. Resp. App. at 335–36, 514; Plfs. Summ. J. Resp. at 60–61.) But Martinez's normal test results create a fact issue regarding whether the hospital actually knew that

---

tions or in serious dysfunction of any bodily organ or part. . . .
(Plfs. Summ. J. Resp. App. at 217.)

**9.** By "serial," the guidelines meant that the enzyme test and EKG should be repeated in four- to eight-hour intervals if the chest pain persisted.

**10.** A cardiac perfusion scan traces the amount of blood reaching the heart during rest and exercise. (Plfs. Summ. J. Resp. App. at 307.)

Martinez had an unstabilized emergency medical condition, which precludes granting Plaintiffs' motion for partial summary judgment on this ground.

URHCS also asserts that it is entitled to summary judgment on Plaintiffs' EMTALA claim regarding stabilization because Martinez was ultimately admitted to the hospital. The regulations governing EMTALA state that "if a hospital has screened an individual ... and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special [EMTALA] responsibilities." 42 C.F.R. § 489.24(d)(2)(i). Plaintiffs have done a good job of pointing out the fact issues intrinsic in this good-faith analysis, which again preclude summary judgment. (Plfs. Summ. J. Resp. at 64–67.)

## IV. MEDICAL NEGLIGENCE

### A. PARTIES' CONTENTIONS

Selvaraj, Porta, and Williamson assert that because Martinez's myocardial infarction occurred at least two to three days before she presented to the emergency department, no alleged act or omission on their parts was the proximate cause of Martinez's death. Plaintiffs respond that their experts dispute the fact that the heart attack occurred before she presented to the emergency department and that Selvaraj's, Porta's, and Williamson's actions and inactions were causative factors in Martinez's death.

### B. APPLICABLE LAW

■■■■ To prevail on a negligence claim in Texas, a plaintiff must establish the existence of a duty, a breach of that duty, and damages proximately cause by the breach. *See W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). In medical-malpractice cases, a plaintiff must prove a proximate causal connection between the alleged negligence and the injuries based on a reasonable medical probability. *See Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex.1995). In other words, a plaintiff must show, by a preponderance of the evidence, that the negligent actions were a substantial factor in causing the harm and without which it would not have occurred. *See Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 400 (Tex.1993). More than one action may be the proximate cause of the same injury. *See Davis v. Dallas County,* 541 F.Supp.2d 844, 853–54 (N.D.Tex.2008). A tortfeasor need not be the last cause or act immediately preceding the injury to proximately cause an injury. *See id.* at 854. Indeed, the negligence of one does not negate the negligence of another. *See id.* "When a new cause cooperates with the defendant's original negligent act in causing the injury, the original defendant remains a proximate cause of the injury, regardless of whether the new concurring act was foreseeable." *J. Wigglesworth Co. v. Peeples,* 985 S.W.2d 659, (Tex.App.-Fort Worth 1999, pet. denied).

### C. DISCUSSION

■■■■ Plaintiffs are correct that the competing experts' opinions regarding when Martinez suffered her heart attack precludes summary judgment on that issue. (Plfs. Summ. J. Resp. at 86–91.) Likewise, the record contains fact issues regarding whether Selvaraj's, Porta's, and Williamson's actions or inactions were the proximate, concurring cause of Martinez's death. Selvaraj, Porta, and Williamson assert that their actions were too attenuated to constitute legal causation. However, how attenuated their actions were from Martinez's death is, at base, a fact question. Porta and Williamson additionally argue that because Martinez had less than a 50% chance of survival, Plaintiffs' negligence claim is barred. Martinez's chance

of survival, even if all measures had been taken, is a fact issue precluding summary judgment.

## V. CONCLUSION

Based on numerous fact issues evident in the copious summary-judgment record, neither Plaintiffs nor URHCS is entitled to summary judgment on Plaintiffs' EMTALA claim. Different fact issues arise regarding Plaintiffs' medical-negligence claims, but bar summary judgment nonetheless.