IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA16-557

Filed: 17 January 2017

Dare County, No. 11 CVS 44

SOUTHERN SHORES REALTY SERVICES, INC., Plaintiff,

v.

WILLIAM G. MILLER, THE MILLER FAMILY LIMITED PARTNERSHIP II, THE MILLER FAMILY LIMITED PARTNERSHIP III, OLD GLORY II, LLC, OLD GLORY III, LLC, OLD GLORY IV, LLC, OLD GLORY V, LLC, OLD GLORY VI, LLC, OLD GLORY VII, LLC, OLD GLORY IX, LLC, OLD GLORY XI, LLC, OLD GLORY XII, LLC, and OLD GLORY XIII, LLC, Defendants.

Appeal by defendants from orders entered on 1 October 2015 and 15 December 2015, and judgment entered 18 November 2015 by Judge Cy A. Grant, Sr. in Dare County Superior Court. Heard in the Court of Appeals 3 November 2016.

*Vandeventer Black LLP, by David P. Ferrell and Kevin A. Rust, for plaintiff-appellee.*

*Gregory E. Wills, P.C., by Gregory E. Wills, for defendants-appellants.*

ZACHARY, Judge.

William G. Miller; The Miller Family Limited Partnership II; The Miller Family Limited Partnership III; Old Glory II, LLC; Old Glory III, LLC; Old Glory IV, LLC; Old Glory V, LLC; Old Glory VI, LLC; Old Glory VII, LLC; Old Glory IX, LLC; Old Glory XI, LLC; Old Glory XII, LLC; and Old Glory XIII, LLC (collectively, defendants), appeal from judgment entered against them following a trial on claims asserted by Southern Shores Realty Services, Inc. (plaintiff), and from the trial court's

denial of defendants' motions for a directed verdict and for entry of Judgment Notwithstanding the Verdict ("JNOV") or in the alternative for a new trial. On appeal, defendants argue that they were entitled to entry of a directed verdict or JNOV on plaintiff's claims for breach of contract against all defendants, and on plaintiff's claim for piercing the corporate veil brought against William G. Miller ("Mr. Miller"). We have carefully reviewed defendants' arguments in light of the record on appeal and the applicable law, and conclude that the trial court did not err and that defendants are not entitled to relief.

## I. Background

This appeal arises out of a dispute concerning thirteen contracts for management of properties available for short-term vacation rental of houses on the North Carolina coast. Plaintiff is a North Carolina real estate company that provides rental management services to the owners of vacation rental properties on the Outer Banks. Plaintiff generally contracts with the owners of properties that are available for short-term rental of less than thirty days. Plaintiff advertises and rents the properties, and provides housekeeping, maintenance, and record-keeping services for the properties' owners. In return, plaintiff earns a commission of 13% of the total rental price for a vacation rental. In order to reserve a house for a short-term vacation rental, prospective tenants are required to deposit half of the total rental amount with plaintiff in advance. When plaintiff receives the deposit, it disburses the deposit

to the owner of the property. When the tenant departs the rental property, plaintiff transfers the remainder of the rental payment to the property's owner.

Defendant William Miller is "the patriarch and speaker for the family business" at issue in the present case, which consists of the construction, rental, and sale of coastal properties. The other defendants are limited liability companies (LLCs) established in North Carolina pursuant to the North Carolina Limited Liability Company Act, N.C. Gen. Stat. § 57D-1-01 *et. seq.* Each LLC was established to manage the construction, rental, and sale of a single coastal property. Mr. Miller is a managing member of each LLC, as are Mr. Miller's wife and their sons.

In 2009, plaintiff signed thirteen contracts with the LLC defendants in the instant case, under the terms of which plaintiff agreed to provide rental management services for the 2010 vacation rental season. The contracts and the correspondence between plaintiff and defendants refer to defendants as "Owner" and to plaintiff as "SSRS" or "Agent." Each of these contracts provided, in relevant part that:

> SSRS will remit rental proceeds collected, less any deductions authorized hereunder . . . to Owner on the following basis: SSRS will disburse up to 50% of the rental rate when the advance payment is made and the balance is disbursed after the tenant's departure provided: (1) this shall not constitute a guarantee by Agent for rental payments that Agent is unable to collect in the exercise of reasonable diligence; (2) payments hereunder are subject to limitations imposed by the VRA regarding advance disbursement of rent; and (3) if, pursuant to this Agreement or required by the VRA, Agent either has refunded or will refund in whole or in part any rental

payments made by a tenant and previously remitted to Owner, Owner agrees to return same to Agent promptly upon Agent's demand. Two exceptions to this policy are:

. . .

2. "Foreclosure" - Owner will report foreclosure on the rental property to Agent and rental proceeds already disbursed to Owner will be returned to SSRS. Any remaining proceeds paid by Tenant will be held by SSRS to ensure the availability of funds for Tenant's rental or refund. If Agent receives information regarding Owner's financial difficulties of any kind, Agent will hold remaining rental income for the protection of Tenant's rental or refund. Foreclosure is a material fact; therefore, Agent is required to disclose knowledge of foreclosure to Tenant.

Plaintiff subscribed to a listing service that included a list of properties that were in foreclosure. In January of 2010, one of defendants' properties that plaintiff had rented to vacation tenants for the summer of 2010 appeared on the foreclosure list. Defendants had not informed plaintiff of this occurrence. David Watson, plaintiff's sales manager and general manager, arranged a meeting with Mr. Miller, at which Mr. Miller agreed to return the rental deposit that plaintiff had disbursed to defendant LLCs for rental of the property. Sharon Bell, who had been plaintiff's accounting supervisor for approximately twenty years, attended the meeting and heard Mr. Miller agree to return the rental deposits that had been disbursed to his businesses for properties that were in foreclosure. However, those funds were never returned to plaintiff, and on 28 January 2010, plaintiff received a letter from an attorney associated with the law firm representing defendants, admitting that five of

the properties subject to contracts between plaintiff and defendants were then in foreclosure. The letter stated in relevant part, the following:

> As Mr. Miller has informed you, Stubbs & Perdue is representing Mr. Miller and Old Glory in his negotiations with various creditors that hold liens on his properties and that you are the rental agency for. I am writing to assure you that we are diligently working on this project and are hopeful that some sort of resolution will be reached.
>
> What we are unsure of is whether this will be inside or outside of bankruptcy. If we are only left with the alternative of filing for bankruptcy, our plan is to file under chapter 11 of the Bankruptcy Code. This will allow Mr. Miller to remain in control of the properties and continu[e] to operate as normal while a plan of reorganization is formulated. Mr. Miller has stressed his intentions to continue utilizing Southern Shores as his rental agency.
>
> Right now the there are two primary factors that would push Mr. Miller into filing for bankruptcy. First would be the inability to reach a compromise with the creditors where a sale of a property would occur. A close second is this notice letter from your agency that might deter renters from selecting Old Glory properties for their vacation.
>
> Mr. Miller and I understand your concern regarding protecting your renters, so let me assure you that we will keep you in the loop as far as our negotiations with creditors. We would appreciate prior notice of your sending out these notice letters. As I have been informed, if we are unsuccessful in dismissing a foreclosure hearing, your intent is to send out the letters two weeks prior to the scheduled sale. Right now, the first scheduled hearing is February 5 and the sale is February 26. We will be attending the hearing and attempt to have the foreclosure dismissed. I will let you know how this goes.

Further, we have advised Mr. Miller to retain the deposits as these are needed to maintain and ready the properties for being rented. . . . Accordingly, it is imperative that Mr. Miller continue to receive deposits from Southern Shores as is specified in the agreement between you and Mr. Miller.

Just in case you are not aware, here is a current list of hearing and sale dates:

[Chart of foreclosure sale dates scheduled for dates between 28 February 2010 and 18 March 2010].

On 3 February 2010, plaintiff received a letter from Mr. Miller individually, in which Mr. Miller stated that:

From: William G. Miller

Subject: Rental Management Agreement - Foreclosures.

I am very disappointed with [plaintiff]. [Plaintiff] is in violation of the 2009 and 2010 Rental Management Agreement, Pars. 7.

As stated - Foreclosure is a material fact.

Property on the disclosure list is not "Foreclosure." The hearing is only to determine if the property is indeed a possible "foreclosure." Even after the hearing, the property is not in "Foreclosure." The hearing determines the appropriate players involved and the real negotiations can start. As a last resort, a Chapter 11 would be filed the day before any announced sale. At that point the players could be forced to accept changes requested.

Holding Rental Income - [Plaintiff] has not received any information of the owners' financial difficulties. . . . [T]his is a "STRATEGIC DEFAULT" [which is] defined

> throughout the United States as "<u>NOT A FINANCIAL DIFFICULTY</u>" but as a process to force an action.
>
> . . . [Plaintiff] has withheld money from <u>ten</u> other properties. Each property is a Limited Liability Company (LLC). . . . <u>This appears to be a willful action to harm my business</u>.
>
> . . .
>
> These are my initial thoughts. I have not run it through my lawyers. Consider this and talk to me within the next two days, so I can plan accordingly.

(Use of capital letters and underlining in original).

One of defendants' properties was sold in foreclosure on 18 March 2010. At that point, defendants had not returned the funds that plaintiff had disbursed to them. On 26 March 2010, plaintiff terminated its contractual relationship with defendants. Plaintiff informed the tenants who had reserved rentals for the summer of 2010 about the foreclosure proceedings and used plaintiff's own funds to recompense the tenants for the rental deposits they had made and that plaintiff had disbursed to defendants. Ultimately, eleven of the thirteen properties that were the subject of contracts between plaintiff and defendants were sold in foreclosure.

On 19 January 2011, plaintiff filed a complaint against defendants, seeking to recover the sum of $74,221.79 that plaintiff had spent from its own funds to recompense the tenants for the tenants' deposits made prior to the initiation of foreclosure proceedings on defendants' properties. Plaintiff asserted claims for breach

of contract and unfair or deceptive trade practices against all defendants, and a claim against Mr. Miller individually, seeking to hold him personally liable for plaintiff's damages by application of the equitable remedy known as "piercing the corporate veil." On 1 April 2011, defendants filed an answer denying the material allegations of plaintiff's complaint, raising various defenses, and asserting counterclaims against plaintiff for breach of contract, breach of fiduciary duty, tortious interference with contract, and unfair or deceptive trade practices. In its reply, plaintiff denied defendants' allegations and moved for dismissal of defendants' counterclaims. On 20 March 2013, Judge Walter H. Godwin, Jr. entered an order granting plaintiff's motion for summary judgment on defendants' counterclaims for breach of fiduciary duty, tortious interference with contract, and unfair or deceptive trade practices, denying plaintiff's motion for summary judgment on defendants' claim for breach of contract, and denying defendants' motion for summary judgment on plaintiff's claims for breach of contract and unfair or deceptive trade practices.

The parties' claims were tried before the trial court and a jury at the 28 September 2015 civil session of Dare County Superior Court. During trial, Mr. Miller testified that he had been employed full-time as a real estate owner and manager since 1987, and that plaintiff and defendants had signed contracts for plaintiff to manage thirteen rental properties for the 2010 summer vacation season. Mr. Miller admitted that in the fall of 2009 defendants stopped making mortgage payments on

the properties that were the subject of their contracts with plaintiff. At that point, Mr. Miller prepared proposed modification agreements for submission to one or more lending institutions and investigated the possibility of declaring bankruptcy. Mr. Miller testified that the plan for each property was to "stop the payments on it and then if we get a foreclosure sale and before the upset period is up, you know, we will file Chapter 11 and we will retain control of that entity through a Chapter 11."

Mr. Miller conceded that the contracts between plaintiff and defendants required defendants to notify plaintiff if a property was in foreclosure and to return rental deposits that had been disbursed to defendants, and that after some of defendants' properties went into foreclosure, defendants did not return the rental deposits that plaintiff had disbursed to defendants. He also admitted that the eleven properties on which he stopped making mortgage payments were sold "on the courthouse steps[.]" In addition, Mr. Miller acknowledged that the contracts further provided that if plaintiff "receives information regarding owner's financial difficulties of any kind" that plaintiff would then "hold remaining rental income for protection of tenants, rental or refund" and that the contracts specified that foreclosure was a material fact that would be disclosed to tenants.

At the close of plaintiff's evidence and again at the close of all the evidence, defendants moved for a directed verdict in their favor. At the close of all the evidence, the trial court granted defendants' motion for directed verdict against plaintiff as to

plaintiff's claims for unfair or deceptive trade practices, but allowed plaintiff's claims for breach of contract and piercing the corporate veil to be submitted to the jury. At the close of all the evidence, plaintiff moved for directed verdict on defendants' claim for breach of contract; the trial court denied plaintiff's motion and defendants' claim for breach of contract was also submitted to the jury.

On 2 October 2015, the jury returned verdicts finding that defendants had breached their contracts with plaintiff; that plaintiff was entitled to recover the sum of $74,221.79 (the amount of rental deposits disbursed to defendants) from defendants; and that Mr. Miller had controlled defendants with respect to the acts or omissions that damaged plaintiff. The jury did not find that plaintiff had breached the contracts with defendants. On 18 November 2015, the trial court entered judgment in accordance with the jury's verdicts. On 24 November 2015, defendants filed a motion asking the trial court to set aside the verdicts of the jury pursuant to N.C. Gen. Stat. § 1A-1, Rule 50(b)(1), and to enter judgment in Mr. Miller's favor with respect to plaintiff's claim to pierce the corporate veil, or in the alternative, to award defendants a new trial pursuant to N.C. Gen. Stat. § 1A-1, Rule 59. Following a hearing on defendants' motions, the trial court entered an order on 15 December 2015, denying defendants' motions. Defendants noted a timely appeal to this Court from the denial of defendants' motion for directed verdict, JNOV, or a new trial, and the judgment entered in this case.

II. Standard of Review

On appeal, defendants argue that the trial court erred by denying their motions for directed verdict and JNOV. "When considering the denial of a directed verdict or JNOV, the standard of review is the same. 'The standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury.' " *Green v. Freeman*, 367 N.C. 136, 140, 749 S.E.2d 262, 267 (2013) (quoting *Davis v. Dennis Lilly Co.*, 330 N.C. 314, 322, 411 S.E.2d 133, 138 (1991)). "A motion for JNOV 'should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's claim.' 'A scintilla of evidence is defined as very slight evidence.' " *Hayes v. Waltz*, __ N.C. App. __, __, 784 S.E.2d 607, 613 (2016) (quoting *Shelton v. Steelcase, Inc.*, 197 N.C. App. 404, 410, 677 S.E.2d 485, 491 (2009), and *Pope v. Bridge Broom, Inc.*, __ N.C. App. __, __ 770 S.E.2d 702, *disc. review denied*, 368 N.C. 284, 775 S.E.2d 861 (2015)). "The party moving for judgment notwithstanding the verdict, like the party seeking a directed verdict, bears a heavy burden under North Carolina law." *Taylor v. Walker*, 320 N.C. 729, 733, 360 S.E.2d 796, 799 (1987).

Defendants also argue that the trial court erred in its instructions to the jury. "When a challenge to the trial court's instructions to the jury raises a legal question, it is subject to review *de novo*. However, . . . '[t]he form and phraseology of issues is in the court's discretion, and there is no abuse of discretion if the issues are

sufficiently comprehensive to resolve all factual controversies.'" *Geoscience Grp., Inc. v. Waters Constr. Co., Inc.*, 234 N.C. App. 680, 686, 759 S.E.2d 696, 700 (2014) (citing *Jefferson Pilot Fin. Ins. Co. v. Marsh USA, Inc.*, 159 N.C. App. 43, 53, 582 S.E.2d 701, 706-07 (2003), and quoting *Barbecue Inn, Inc. v. CP & L*, 88 N.C. App. 355, 361, 363 S.E.2d 362, 366 (1988)).

### III.  Breach of Contract

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citation omitted).  In this case, the parties stipulated to the existence of valid contracts between defendants and plaintiff.  As discussed above, each of the parties' contracts stated, in relevant part, that:

> . . . SSRS will disburse up to 50% of the rental rate when the advance payment is made and the balance is disbursed after the tenant's departure provided . . . if, pursuant to this Agreement or required by the VRA, Agent either has refunded or will refund in whole or in part any rental payments made by a tenant and previously remitted to Owner, Owner agrees to return same to Agent promptly upon Agent's demand. . . .
>
> . . . Owner will report foreclosure on the rental property to Agent and rental proceeds already disbursed to Owner will be returned to SSRS. Any remaining proceeds paid by Tenant will be held by SSRS to ensure the availability of funds for Tenant's rental or refund.  If Agent receives information regarding Owner's financial difficulties of any kind, Agent will hold remaining rental income for the protection of Tenant's rental or refund.  Foreclosure is a

material fact; therefore, Agent is required to disclose knowledge of foreclosure to Tenant.

We hold that the terms of each of the contracts plainly required that if a rental property was subject to foreclosure, defendants would (1) notify plaintiff of the foreclosure proceeding, and (2) return to plaintiff any rental income that plaintiff had previously disbursed to defendants for the property that was in foreclosure. Plaintiff presented ample evidence establishing that defendants failed to perform either of these contractual obligations, and defendants do not dispute that they did not return the rental deposits that plaintiff had disbursed prior to learning that some of defendants' properties were in foreclosure. We conclude that plaintiff presented evidence to support each element of its claims for breach of contract and that the trial court did not err by denying defendants' motions for directed verdict and JNOV with respect to these claims.

In reaching this conclusion, we have carefully evaluated defendants' arguments urging us to reach a different result. Defendants' primary argument is that the result in this case should be dictated, not by the express terms of the parties' contracts, but by the statutory provisions of the North Carolina Vacation Rental Act ("VRA"), N.C. Gen. Stat. § 42A-1 *et. seq*. Defendants direct our attention to references in the contracts in which the parties acknowledge their obligation to adhere to all applicable law, including the VRA. For example, each of the contracts states that:

> . . . Owner hereby contracts with Agent, and Agent hereby contracts with Owner, to lease and manage the property . . . in accordance with all applicable laws and regulations, including but not limited to the North Carolina Vacation Rental Act (NCGS 42A-1 *et. seq.*) . . . upon the terms and conditions contained herein.

Defendants argue that their appeal raises a "matter of first impression" regarding the proper interpretation of N.C. Gen. Stat. § 42A-19(a) (2015), which states in relevant part that:

> The grantee of residential property voluntarily transferred by a landlord who has entered into a vacation rental agreement for the use of the property shall take title to the property subject to the vacation rental agreement if the vacation rental is to end not later than 180 days after the grantee's interest in the property is recorded in the office of the register of deeds.

N.C. Gen. Stat. § 42A-19(a) requires the buyer of property acquired in a *voluntary* transfer from the owner to honor previously executed vacation rental agreements that are scheduled within six months of the voluntary transfer. efendants contend that this provision also applies to property that is *involuntarily* transferred in a foreclosure proceeding. Defendants apparently assume that a tenant who has contracted for a short-term vacation rental of one or two weeks might choose to litigate the tenant's right to insist on the rental of a property that had been sold in foreclosure. As a practical matter, this seems unlikely; however, we conclude that on the facts of this case we are not required to resolve any issues pertaining to the VRA or to determine the correct interpretation of its provisions.

Assuming, *arguendo*, that defendants have correctly interpreted the scope of N.C. Gen. Stat. § 42A-19, this does not change the outcome of this case. The plain language of the parties' contracts required defendants to notify plaintiff if a rental property was in foreclosure, and to refund any previously disbursed rental payments associated with the property. "When competent parties contract at arm's length upon a lawful subject, as to them the contract is the law of their case." *Suits v. Insurance Co.*, 249 N.C. 383, 386, 106 S.E.2d 579, 582 (1959). "[T]o ascertain the intent of the parties at the moment of execution . . . the court looks to the language used[.] . . . Presumably the words which the parties select were deliberately chosen and are to be given their ordinary significance." *Briggs v. Mills, Inc.*, 251 N.C. 642, 644, 111 S.E.2d 841, 844 (1960) (citations omitted).

Defendants suggest that because their contracts recite that the parties will follow the applicable provisions of the VRA - which would be required whether or not the contracts included the reference to the VRA - the terms of the contracts are thereby *replaced* by the VRA, which defendants contend "control[s] the relationship between all the parties[.]" Defendants have not cited any authority for the proposition that a contract's reference to relevant statutory provisions nullifies the contract's express terms, and we know of no authority for this position. We conclude that defendants have failed to show that the VRA conflicts with or replaces the terms of the parties' contracts, and that the interpretation of the VRA is not germane to the

issue of defendants' entitlement to a directed verdict on plaintiff's claims for breach of contract.

Defendants also argue that, although the parties' contracts state that defendants "will report foreclosure on the rental property to Agent" and that "rental proceeds already disbursed to Owner will be returned to SSRS," these obligations do not arise until the entire foreclosure proceeding is completed and the deed to the property is transferred to a new owner. Defendants contend that the fact that "the VRA defines 'Transfer' as 'recording at the registrar of deeds'" requires the conclusion that "the term 'Foreclosure,' in this context, must mean the point at which a deed vesting title in the lender is recorded at the registrar of deeds[.]" However, "foreclosure" is defined as "[a] legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property." Black's Law Dictionary 719 (9th ed. 2009). It is long established that "[i]n construing contracts ordinary words are given their ordinary meaning unless it is apparent that the words were used in a special sense. 'The terms of an unambiguous contract are to be taken and understood in their plain, ordinary and popular sense.'" *Harris v. Latta*, 298 N.C. 555, 558, 259 S.E.2d 239, 241 (1979) (internal quotation omitted). We conclude that the term "foreclosure" in the parties' contracts should be interpreted in its ordinary meaning as being a legal proceeding by a mortgagee brought against a mortgagor

who has defaulted on payments due under the terms of a mortgage contract. Therefore, defendants' contractual obligation to notify plaintiff of foreclosure proceedings arose when these proceedings were initiated.

Defendants also argue that the trial court erred in its instructions to the jury on the effect of a sale in foreclosure upon a vacation rental tenant's legal right to enforce a short-term lease entered into prior to the foreclosure. Neither the trial court's instructions to the jury nor the verdict sheets submitted to the jury asked the jury to render a verdict on the effect of a foreclosure upon a tenant's legal right to force the purchaser of a property to honor a short-term vacation rental lease. At one point during its deliberations, the jury asked for instructions on the definition of the term "foreclosure" and on whether a bank that purchased a property in foreclosure would be required to honor a vacation rental agreement. The trial court instructed the jury on the definition of foreclosure taken from Black's Law Dictionary, 9th ed., as quoted above, and we conclude that the trial court did not err in giving this definition. The trial court further instructed the jury that our appellate jurisprudence had not established whether a bank would be obligated to honor a vacation rental lease after buying a property in foreclosure but that, as a general rule, "the sale under a mortgage or deed of trust cuts out and extinguishes all liens, encumbrances and junior mortgages executed subsequent to the mortgage containing the power."

Defendants contend that the trial court's instruction failed to account for an exception to the general rule established by the provisions of the VRA. However, as discussed above, the parties' contracts imposed certain duties upon defendants in the event of a foreclosure on a property that was subject to a short-term rental. These contractual obligations were not dependent upon or associated with the issue of the rights of a short-term vacation rental tenant upon foreclosure of a property subject to a short-term vacation lease, and the jury was not required to resolve any factual issues regarding the effect of foreclosure upon a tenant's rights in its determination of the merits of the parties' respective claims. Defendants have failed to articulate any way in which the trial court's instructions on this issue, even if erroneous, would have confused the jury as to any of the substantive issues it was required to resolve or would have affected the jury's verdict on plaintiff's claims for breach of contract. We conclude that this argument is without merit.

For the reasons discussed above, we conclude that plaintiff presented more than a scintilla of evidence to support each element of its claims for breach of contract. Therefore, the trial court did not err by denying defendants' motions for directed verdict, for entry of a JNOV, or for a new trial on these claims.

## IV.  Piercing Corporate Veil

Mr. Miller argues that the trial court erred by denying his motion for directed verdict, entry of JNOV, or award of a new trial on plaintiff's claim seeking to hold

him personally liable for plaintiff's damages by applying the equitable doctrine of piercing the corporate veil. For the reasons that follow, we disagree.

### A. Introduction: Legal Principles

The determination of whether an individual may be held personally liable for the debts of a business entity with which the individual is associated depends in part upon the nature of the entity. "The general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438, 666 S.E.2d 107, 112 (2008) (citation omitted). However:

> [E]xceptions to the general rule of corporate insularity may be made when applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim. Those who are responsible for the existence of the corporation are, in those situations, prevented from using its separate existence to accomplish an unconscionable result.

*Ridgeway*, 362 N.C. at 439, 666 S.E.2d at 112-113 (internal quotation omitted). Thus, "courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985) (citation omitted). A court's decision to pierce the corporate veil, thereby "proceeding beyond the corporate form[,] is a

strong step: Like lightning, it is rare [and] severe [.]" *Ridgeway* at 439, 666 S.E.2d at 112 (internal quotation omitted).

The limitation upon circumstances in which a corporate officer or shareholder may be personally liable for debts incurred by the corporation is an important distinction between the law governing corporations and that of partnerships. "Shareholders in a corporation are insulated from personal liability for acts of the corporation, . . . but partners in a partnership are not insulated from liability[.] . . . Stated differently, no corporate veil exists between a general partnership and its partners." *Ron Medlin Constr. v. Harris*, 364 N.C. 577, 583, 704 S.E.2d 486, 490 (2010).

In the present case, the defendants, with the exception of Mr. Miller, are limited liability companies, or LLCs. "An LLC is a statutory form of business organization . . . that combines characteristics of business corporations and partnerships." *Hamby v. Profile Prods., L.L.C.*, 361 N.C. 630, 636, 652 S.E.2d 231, 235 (2007) (internal quotation omitted). "[T]he North Carolina Limited Liability Company Act provides for the formation of a business entity combining the limited liability of a corporation and the more simplified taxation model of a partnership. . . allowing for great flexibility in its organization." *Id.* "[A]s its name implies, limited liability of the entity's owners, often referred to as 'members,' is a crucial characteristic of the LLC form, giving members the same limited liability as corporate

shareholders. . . . As a corporation acts through its officers and directors, so an LLC acts through its member-managers[.]" *Id.* In addition, N.C. Gen. Stat. § 57D-3-30 (2015) provides that a "person who is an interest owner, manager, or other company official is not liable for the obligations of the LLC solely by reason of being an interest owner, manager, or other company official."

However, our appellate courts have generally upheld the imposition of personal liability upon an individual manager of an LLC under the same circumstances that support piercing the corporate veil. "[A] judgment in this area requires a peculiarly individualized and delicate balancing of competing equities. Nevertheless, for the purpose of achieving uniformity and predictability in this critical area of jurisprudence, this Court has previously adopted the 'instrumentality rule.'" *Ridgeway* at 440, 666 S.E.2d at 113 (quoting *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985)). In *Glenn,* our Supreme Court "enumerated three elements which support an attack on [a] separate corporate entity under the instrumentality rule[.]" *Glenn,* 313 N.C. at 454, 329 S.E.2d at 330. The Court described these elements as follows:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a

statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id*. at 455, 329 S.E.2d at 330 (internal quotation omitted). The Court also set out

circumstances that have proven useful in determining whether it is appropriate to

pierce the corporate veil in a specific case:

Factors which heretofore have been expressly or impliedly considered in piercing the corporate veil include:
1. Inadequate capitalization[.] . . .
2. Non-compliance with corporate formalities. . . .
3. Complete domination and control of the corporation so that it has no independent identity. . . .
4. Excessive fragmentation of a single enterprise into separate corporations. . . .

*Glenn* at 455, 329 S.E.2d at 330-31 (citations omitted). These factors may be weighed

differently in a case in which the business entity in question is an LLC rather than a

corporation. For example, N.C. Gen. Stat. § 57D-3-20 (2015) provides in relevant part

that "(a) The management of an LLC and its business is vested in the managers[,]"

and that "(d) All members by virtue of their status as members are managers of the

LLC[.]" Given that all members of an LLC are statutorily deemed to be managers,

the fact that an individual has a management role in an LLC cannot, standing alone,

justify imposing personal liability upon the manager on the grounds that he or she

exercised "control" over the LLC.

### B. Discussion

Preliminarily, we address the scope of defendants' appellate arguments. Plaintiff argues that our review should be limited to the arguments that defendants made on the issue of piercing the corporate veil at the trial level, in their motions for entry of a directed verdict. However, defendants have also appealed from the denial of their motion for entry of JNOV or the award of a new trial. We will therefore address arguments that defendants raised at either hearing.

As discussed above, to hold Mr. Miller personally liable for the judgment entered against defendants:

> [Plaintiff] must present evidence of three elements:
> "(1) Control . . . complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked[;] . . . and (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a . . . positive legal duty . . . in contravention of [a] plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."

*Green v. Freeman*, 233 N.C. App. 109, 111, 756 S.E.2d 368, 371-72 (2014) (quoting *Green*, 367 N.C. at 146, 749 S.E.2d at 270 (internal citations and quotations omitted)).

We next determine whether plaintiff offered "more than a scintilla" of evidence as to these elements. In making this determination, we will also consider the evidence of the factors discussed above, including inadequate capitalization, excessive fragmentation of a single enterprise into separate LLCs, and whether Mr. Miller exercised complete domination and control over the LLCs. We conclude that

the non-compliance with corporate formalities, which is another factor identified in *Glenn*, is of less relevance in the context of an LLC, which is subject to far fewer formal statutory requirements than is a corporation. We also recognize that the mere fact that Mr. Miller had a management role in the LLCs cannot be the basis for imposing personal liability upon him.

It is undisputed that eleven of the thirteen properties that were the subject of the contracts between the parties were sold in foreclosure, and that during the course of the foreclosure proceedings Mr. Miller informed plaintiff that defendants might be forced to declare bankruptcy. The LLCs did not have sufficient capital to pay creditors and conduct business. We conclude that this is evidence tending to show that the LLCs were inadequately capitalized. In addition, the fact that a separate LLC was formed for the management of each individual rental property constitutes evidence from which a reasonable fact-finder might find that defendants' business enterprise was excessively fragmented. We note that at trial, Mr. Miller testified that the reason that defendants formed 30 or 40 LLCs for the business was to limit the liability of the LLCs.

We also conclude that plaintiff offered sufficient evidence to support a finding that Mr. Miller personally controlled the finances, policies, and business practices of the LLCs. In this respect, we note that at trial Mr. Miller acknowledged that he was in charge of managing the family business:

> MR. MILLER: Well we're all managing members and we all have the capability of signing papers and that sort of thing. It's been agreed at this point in time that we have an agreement within ourselves that, you know, I'm the present managing member but that James there is going to take over and he will have control.

Two of plaintiff's witnesses at trial, Mr. Watson and Ms. Bell, testified that their business dealings were always with Mr. Miller, whom they understood to be the "decision maker" for the LLCs. In fact, *defendants'* counsel asked Mr. Watson to acknowledge on cross-examination that "Mr. Miller [had] told [him] . . . that if there was any kind of bankruptcy done *he* would remain in charge[.]" (emphasis added). In addition, the attorney who wrote to plaintiff stated that the law firm with which he was associated represented "Mr. Miller and [the LLCs]" but did not indicate that the firm represented any other members of the LLCs individually. The content of the letter unmistakably characterized Mr. Miller as the "alter ego" of the family business. For example, the letter stated that a plan was being formulated that "will *allow Mr. Miller to remain in control* of the properties[,]" proclaimed that "Mr. Miller has stressed his intentions to continue utilizing [plaintiff] Southern Shores as *his* rental agency[,]" noted the existence of "two primary factors that would *push Mr. Miller into filing for bankruptcy*[,]" and warned plaintiff that "it is imperative that Mr. Miller continue to receive deposits from [plaintiff] Southern Shores as is specified in the *agreement between you and Mr. Miller*." Moreover, Mr. Miller wrote to plaintiff individually to express his opinions on matters in contention between the parties.

Finally, we note that in their appellate brief, *defendants* describe Mr. Miller as "the patriarch and speaker for the family business."

As discussed above, in order to survive a motion for directed verdict or JNOV, the non-movant need only present "more than a scintilla of evidence" on each element of its claim. *Stark v. Ford Motor Co.*, 365 N.C. 468, 480, 723 S.E.2d 753, 761 (2012) (citation omitted). It is well established that in ruling on a motion for directed verdict or JNOV, "the trial court is to consider all evidence in the light most favorable to the party opposing the motion; the nonmovant is to be given the benefit of every reasonable inference that legitimately may be drawn from the evidence; and contradictions must be resolved in the nonmovant's favor." *Smith v. Price*, 315 N.C. 523, 527, 340 S.E.2d 408, 411 (1986). In this case, we conclude that plaintiff presented more than a scintilla of evidence from which the jury could find that Mr. Miller exercised complete control over the LLCs. We also conclude that plaintiff offered sufficient evidence that Mr. Miller used his control over the LLCs to disregard the contractual obligation to return the rental deposits to plaintiff and that Mr. Miller's actions were the proximate cause of the damages suffered by plaintiff. As a result, we conclude that the trial court did not err by denying defendants' motions for directed verdict or JNOV.

In their appellate brief, defendants direct our attention to the facts that the LLCs were properly formed under North Carolina law and that Mr. Miller did not

own a majority share of the businesses. We have held, however, that plaintiff offered evidence of Mr. Miller's complete domination of the LLCs sufficient to allow the jury to determine whether he should be held personally liable for the judgment against defendants. Defendants also concede that an individual may be "held personally liable" when an individual's exercise of control is used to violate a duty owed to a plaintiff. In this case, there was evidence indicating that (1) defendants owed a duty to return to plaintiff the rental deposits previously disbursed when the properties went into foreclosure; (2) Mr. Miller made the substantive decisions for the LLCs and was known as the "decision maker"; (3) Mr. Miller refused to comply with this contractual obligation, even writing a letter to plaintiff as an individual (the letter in no way suggested that he was writing on behalf of other LLC members) expressing his personal "disappointment" with plaintiff; and (4) the damages suffered by plaintiff were directly and proximately caused by Mr. Miller's refusal to return the rental deposits. We conclude that defendants' argument regarding the insufficiency of plaintiff's evidence is without merit.

Defendants also argue, in a somewhat dramatic fashion, that unless the trial court is reversed "the concept of limited liability [will be] eliminated entirely from the law of contracts in North Carolina," with the result that any member of an LLC with "whom the opposing party actually deals with on a day-to-day basis, would be subject to personal liability for breach of the LLC's contract." Defendants contend that if we

uphold the jury's verdict "then there is no point in having a 'limited liability' company in this State." We disagree with defendants' implication that the instant case is in some way extending or changing the established law concerning the imposition of personal liability on an individual based upon his or her actions in relation to a business entity. For example, it seems clear that on the facts of this case there would be *no* basis upon which to hold any of the other member-managers of the LLCs personally liable. Nor is Mr. Miller's liability premised simply upon his exercise of ordinary daily management of the LLCs. Instead, it appears that he made the decision to intentionally breach the parties' contracts without input from the other LLC members, and attempted to use the LLCs to achieve an unjust result. We also note that, to the extent that defendants are urging that as a matter of public policy the law governing individual liability in the context of an LLC should be changed, "[t]he General Assembly is the policy-making agency because it is a far more appropriate forum than the courts for implementing policy-based changes to our laws." *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004). We conclude that "plaintiff has carried his minimal burden of presenting more than a scintilla of evidence supporting his . . . claim." *Morris v. Scenera Research, LLC*, 368 N.C. 857, 862, 788 S.E.2d 154, 158 (2016).

For the reasons discussed above, we conclude that the trial court did not err by denying defendants' motions for directed verdict or JNOV and that its orders should be

AFFIRMED.

Judges ELMORE and STROUD concur.