Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC, 2017 NCBC 14.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 1783

INSIGHT HEALTH CORP. d/b/a
INSIGHT IMAGING,

        Plaintiff,

v.

MARQUIS DIAGNOSTIC IMAGING
OF NORTH CAROLINA, LLC;
MARQUIS DIAGNOSTIC IMAGING,
LLC; JOHN KENNETH LUKE;
GENE VENESKY; and TOM
GENTRY,

        Defendants.

**ORDER AND OPINION ON
PLAINTIFF'S MOTION TO DISMISS
AND FOR PARTIAL SUMMARY
JUDGMENT AND PLAINTIFF'S
MOTION TO EXCLUDE**

1. **THIS MATTER** is before the Court upon (i) Plaintiff Insight Health Corporation d/b/a Insight Imaging's ("Insight") Motion to Dismiss and for Partial Summary Judgment (collectively, the "Motion for Summary Judgment"); and (ii) Plaintiff Insight's Motion to Exclude Testimony of Marcus Hodge (the "Motion to Exclude") (collectively, the "Motions") in the above-captioned case.

2. Having considered the Motions and supporting documents, the parties' briefs in support of and in opposition to the Motions, appropriate matters of record, and the arguments of counsel made at the hearing held in this matter on June 28, 2016, the Court concludes that Insight's Motion for Summary Judgment should be **GRANTED in part** and **DENIED in part**, and, in the exercise of its discretion, that Insight's Motion to Exclude should be **GRANTED in part** and **DENIED in part.**

*Smith Moore Leatherwood, LLP, by Marcus C. Hewitt and Jeffery R. Whitley, for Plaintiff Insight Health Corporation d/b/a Insight Imaging.*

*Roberts & Stevens, P.A., by Wyatt S. Stevens, Ann-Patton Hornthal, and John D. Noor, for Defendants Marquis Diagnostic Imaging of North Carolina, LLC, Marquis Diagnostic Imaging, LLC, John Kenneth Luke, Gene Venesky, and Tom Gentry.*

Bledsoe, Judge.

## I.

## BACKGROUND AND PROCEDURAL HISTORY

3. This action arises out of two transactions—a lease agreement for a magnetic resonance imaging ("MRI") scanner and a contemplated asset purchase—between Insight and Defendant Marquis Diagnostic Imaging of North Carolina, LLC ("MDI-NC"). Insight also asserts claims against Marquis Diagnostic Imaging, LLC ("MDI"), John Kenneth Luke ("Luke"), Gene Venesky ("Venesky"), and Tom Gentry ("Gentry"), all of whom are direct and indirect owners and operators of MDI-NC.

4. The Court does not make findings of fact while ruling on a motion for summary judgment. *Hyde Ins. Agency, Inc., v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975). The following factual background is summarized from uncontested facts before the Court.

A. Factual Background

5. Defendants Luke and Venesky each hold a 49.5% membership interest in MDI, an LLC organized under Delaware law. (Pl.'s Mot. Dismiss and Partial Summ. J., hereinafter "Pl.'s Mot. Summ. J.," Ex. 3 ¶ 2.) MDI, in turn, is the sole member of MDI-NC and several related entities, including Marquis Diagnostic Imaging of Georgia, LLC and Marquis Diagnostic Imaging of Arizona, LLC ("MDI Arizona"). (Pl.'s Mot. Summ. J. Ex. 2 ¶ 1.) Luke serves as CEO and President of MDI, a

designated manager of MDI, and CEO of MDI-NC. (Pl.'s Mot. Summ. J. Ex. 3 ¶ 2.) Venesky serves as a manager of both MDI and MDI-NC. (Pl.'s Mot. Summ. J. Ex. 3 ¶ 2.) Gentry serves as the CFO of MDI. (Pl.'s Mot. Summ. J. Ex. 3 ¶ 2.)

6. MDI-NC was organized in North Carolina by MDI in order to do business within this state. This business included operating an imaging center in Asheville, North Carolina.

7. Plaintiff Insight is a Delaware corporation authorized to conduct business in North Carolina. Part of Insight's business involves leasing and operating MRI scanners. In 2011, Insight's Senior Vice President of Corporate Development, Scott McKee ("McKee"), approached Luke and Venesky about Insight's potential purchase of MDI-NC's assets. (Pl.'s Mot. Summ. J. Ex. 1.) As it contemplated its offer price for this transaction, Insight used its own financial model based on its own expense assumptions. (Pl.'s Mot. Summ. J. Ex. 8; Pl.'s Mot. Summ. J. Conf. Ex. 1.) Insight requested specific financial information from MDI-NC for the purpose of increasing the accuracy of its model; namely, Insight requested the imaging center's balance sheet and income statement and MDI-NC's average reimbursement rate for performing MRI and CT scans. (Pl.'s Mot. Summ. J. Ex. 8.) Despite seeking this information, Insight's model still depended on a number of financial assumptions. (Pl.'s Mot. Summ. J. Conf. Ex. 2 pp. 7–9.)

8. At the outset of negotiations, MDI-NC had an existing long-term lease with Alliance Healthcare Services ("Alliance") for an MRI scanner. (Am. Countercl. ¶ 8.) Under the circumstances, Insight did not desire to purchase MDI-NC's assets with

the Alliance lease, and negotiations stalled. (Pl.'s Mot. Summ. J. Ex. 21; Am. Countercl. ¶ 8.) Negotiations resumed after MDI-NC informed Insight that MDI-NC could terminate the Alliance MRI lease. (Pl.'s Mot. Summ. J. Ex. 21; Am. Countercl. ¶ 10.)

9. Negotiations continued, and on June 12, 2012, Insight and MDI-NC executed a Letter of Intent (the "LOI"), which set forth the parties' "preliminary and non-binding understanding" of the contemplated asset purchase. (Pl.'s Mot. Summ. J. Ex. 5, hereinafter "LOI," Preamble.) The LOI also provided that the final asset purchase would be conditioned upon Insight's satisfaction following its due diligence examination of MDI-NC's assets. (LOI ¶ 8.) The purchase price proposed in the LOI was $2.1 million. (LOI ¶ 4.) The LOI affirmed that it "intended to constitute a non-binding expression of the mutual intent of the parties," which would not obligate the parties to enter into the final transaction and would not create liability on any party for terminating negotiations.[1] (LOI ¶ 16.)

10. One month after executing the LOI, MDI-NC entered into an agreement to lease a new MRI scanner from Insight. (Pl.'s Mot. Summ. J. Ex. 6, hereinafter "Insight MRI Agreement" or "Agreement.") MDI-NC leased the MRI scanner used in its Asheville facility, first from Alliance and later from Insight, because MDI-NC did not possess a Buncombe County Certificate of Need ("CON"). (Pl.'s Mem. Supp. Mot. Exclude 2.) Insight was able to lease the MRI scanner to MDI-NC because Insight

---

[1] The Court has discussed the effect of the Letter of Intent in detail in its earlier opinion in *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2016 NCBC LEXIS 77 (N.C. Super. Ct. Oct. 7, 2016).

possessed one of ten existing Buncombe County MRI CONs. (Pl.'s Mem. Supp. Mot. Exclude 2.)

11. Under the Insight MRI Agreement, Insight agreed to provide a Siemens Espree MRI scanner, support staff for the unit, and other services to MDI-NC for a monthly fee, starting at $79,000 the first year and increasing by $1,000 in each subsequent year of the Agreement's seven-year term. (Insight MRI Agreement ¶ 3, Schedule A.) The Agreement did not mention the ongoing asset purchase negotiations or the LOI and included a merger clause stating that the Insight MRI Agreement "constitute[d] the entire agreement between the parties pertaining to the subject matter [therein] and supersede[d] all prior and contemporaneous agreements, representations, and understandings . . . oral or written." (Insight MRI Agreement ¶ 13.) Similarly, the LOI did not mention an MRI lease as part of the proposed asset purchase. The parties later amended the LOI to provide that Insight would release MDI-NC from the Insight MRI Agreement if the asset sale was completed. (Pl.'s Mot. Summ. J. Ex. 7.) The parties did not include a similar amendment to provide that Insight would release MDI-NC from the Insight MRI Agreement in the event the asset sale did not occur.

12. Insight and MDI-NC continued to negotiate the asset purchase throughout 2012 and into 2013. In July of 2013, Gentry provided Insight with MDI-NC's most recent profit and loss statements. (McKee Aff. Ex. 4.) When Insight updated its financial model using these new figures, it concluded $2.1 million was not a fair purchase price for MDI-NC's assets. (McKee Aff. Ex. 4.) McKee communicated this

information to Gentry in August of 2013 and requested accurate reimbursement rate figures, which Insight had previously estimated based on 2011 revenue figures. (Pl.'s Mot. Summ. J. Ex. 12.)

13. After receiving accurate reimbursement rate figures, Insight updated its financial model again. In an e-mail to McKee, Insight's financial analyst wrote:

> [The updated model] does leave me scratching my head regarding some of the numbers we received in the past related to revenue and volume through Feb[ruary] 2011. I think there must have been some timing differences that led to incorrect reimbursement estimates. This is the first time we've received quality information from them on the subject.
> . . .
> I've left the $2.1 million purchase price showing [on the attached model]. But, obviously that doesn't work under the current model assumptions.

(McKee Aff. Ex. 5.) McKee informed Gentry that Insight had erred in calculating the initial $2.1 million purchase price, and Gentry stated that MDI-NC was willing to sell its assets for a reduced purchase price of $1.4 million. (McKee Aff. Ex. 7.) Shortly thereafter, Insight rejected MDI-NC's counteroffer, and McKee informed MDI-NC that Insight was only willing to pay $250,000 and assume MDI-NC's office lease.[2] (McKee Aff. ¶ 19.) Several days thereafter, on August 26, 2013, Gentry told Luke and Venesky, "Insight is out as far as I am concerned." (Pl.'s Mot. Summ. J. Ex. 16.)

14. On November 15, 2013, MDI-NC ceased its operations and sold its assets to another company for $1.15 million. (Pl.'s Mot. Summ. J. Conf. Ex. 5.) MDI-NC ceased using Insight's MRI scanner at that time and made no further payments under the Insight MRI Agreement for amounts due after the date of the sale. (Gentry Dep.

---

[2] Over the course of the proceedings there has been some confusion about whether the offered amount was $200,000 or $250,000. The exact number is not consequential to the Court's ruling.

210:1–22.) Defendants assert MDI-NC was not obligated to continue its payments under the Agreement for the remainder of the lease term because Insight had withdrawn from the asset purchase negotiations. (Gentry Dep. 248:7–12.) Defendants also contend that, in any event, MDI-NC was insolvent and without sufficient funds to pay Insight after the asset sale on November 15. (Gentry Dep. 248:7–12.)

15. At the time MDI-NC ceased operations, Insight's MRI scanner was in place at MDI-NC's Asheville location. In March 2014, a current Insight customer in Vermont, Springfield Hospital, inquired of Insight about upgrading its MRI lease agreement with Insight to acquire the same MRI scanner model that Insight had leased to MDI-NC (i.e., a Siemens Espree MRI scanner). (Pl.'s Mem. Supp. Mot. Exclude 3.) Because MDI-NC was no longer using the Siemens Espree MRI unit that Insight had leased to MDI-NC, Insight agreed to lease that device to Springfield Hospital for $40,600 per month. (Pl.'s Mot. Exclude Conf. Ex. 1, hereinafter "Springfield Amendment," Schedule A, § 6.)

16. At the same time, and in order to maintain its Buncombe County CON, Insight associated another MRI, deployed from Insight's inventory, with the CON through the North Carolina Department of Health and Human Services and placed this machine in storage. In April 2015, Insight secured another MRI lease using its Buncombe County CON, this time with Blue Ridge Bone & Joint ("Blue Ridge"), and moved the new MRI device from storage to Blue Ridge's facility. (Pl.'s Mot. Exclude

4.)  In his expert report, Insight's damages expert counted the Blue Ridge lease, but not the Springfield Amendment, as mitigating revenue.

B.  Procedural Background

17.    Insight commenced this action against Defendants on April 25, 2014, and later filed an Amended Complaint on December 4, 2014.  Insight brings claims against MDI-NC and the other named defendants for breach of contract, fraudulent transfer under N.C. Gen. Stat. § 39–23 *et seq.*, unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1 *et seq.*, and wrongful distribution and personal liability under N.C. Gen. Stat. § 57C-4-06 *et seq.*.  Insight further asks the Court to hold MDI, as the sole member of MDI-NC, and Luke and Venesky, as owners of MDI, personally liable for Insight's damages under the equitable remedy of piercing the corporate veil.  Insight also brings claims against MDI, Luke, Venesky, and Gentry for breach of fiduciary duty and constructive fraud.

18.    On March 7, 2016, MDI-NC asserted Amended Counterclaims against Insight for fraud in the inducement and unfair or deceptive trade practices, contending that Insight wrongfully induced MDI-NC to terminate MDI-NC's MRI lease with Alliance and enter into the Insight MRI Agreement by misrepresenting Insight's intent to purchase MDI-NC's assets for $2.1 million, with the result that MDI-NC was ultimately forced to sell its assets for substantially less than Insight had originally offered.  (*See* Am. Countercl. ¶¶ 30–31.)

19.    Insight's Motion to Dismiss and for Partial Summary Judgment asks the Court to dismiss MDI-NC's counterclaims and grant partial summary judgment on

Insight's breach of contract, unfair or deceptive trade practices, and corporate veil-piercing claims. After moving for partial summary judgment, Insight filed the Motion to Exclude, seeking to exclude testimony of MDI-NC's retained expert, Marcus Hodge ("Hodge"). The Court held a hearing on both Motions, and the Motions are now ripe for resolution.

II.

MOTION FOR SUMMARY JUDGMENT

A. <u>Legal Standard</u>

20.    Insight's Motion to Dismiss and for Partial Summary Judgment seeks summary judgment in its favor on some of its own claims under Rule 56 of the North Carolina Rules of Civil Procedure. With regard to MDI-NC's counterclaims, Insight's Motion for Summary Judgment seeks dismissal under Rule 12(b)(6) or, in the alternative, summary judgment under Rule 56. When "matters outside the pleading[s] are presented to and not excluded by the court," a motion under Rule 12 "shall be treated as one for summary judgment and disposed of as provided in Rule 56." N.C. R. Civ. P. 12(b); *see also Stanback v. Stanback*, 297 N.C. 181, 205, 254 S.E.2d 611, 627 (1979). Both parties have presented extensive evidence outside the pleadings for the Court's consideration. Having determined that all parties have been given a reasonable opportunity to present pertinent material, the Court elects to consider the evidence and determines Insight's Motion for Summary Judgment solely under N.C. R. Civ. P. 56. *See, e.g., Williams v. Advance Auto Parts, Inc.*, 2017 N.C. App. LEXIS 21, at *8 (N.C. Ct. App. 2017) (affirming trial court's consideration of

Rule 12(b)(6) motion under Rule 56 where parties moved under Rule 56 in the alternative and submitted documentary evidence in support).

21. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that" the movant is "entitled to judgment as a matter of law." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C. R. Civ. P. 56(c)). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).

22. The moving party bears the burden of showing no questions of material fact remain to be resolved. *Camalier v. Jeffries*, 340 N.C. 699, 706, 460 S.E.2d 133, 136 (1995). Summary judgment against an adverse party's claim will only be granted if the movant can prove "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense." *Dobson*, 352 N.C. at 83, 520 S.E.2d at 835. That said, when faced with a motion for summary judgment, the responding party must put forward specific facts showing there is a genuine issue for trial and may not merely "rest upon the . . . allegations or denials" within its pleading. N.C. R. Civ. P. 56(e).

B. Fraud

23. Insight moves for summary judgment on MDI-NC's fraud counterclaim. As the basis of this counterclaim, MDI-NC alleges that Insight fraudulently induced MDI-NC to enter into the Insight MRI Agreement. Specifically, MDI-NC contends

that "Insight's representations to [MDI-NC] regarding its intention to purchase the assets of [MDI-NC] for a reasonable agreed price were made with reckless disregard for the truth in light of [Insight's] false and erroneous valuation." (Am. Countercl. ¶ 33.) MDI-NC also claims that Insight sought to induce MDI-NC to terminate its existing MRI lease, sign a new lease with Insight, and take itself off the market, when Insight never actually intended to purchase MDI-NC's assets for a reasonable price. (Am. Countercl. ¶¶ 30, 35.) MDI-NC contends Insight's conduct amounted to fraud in the inducement and that MDI-NC has proffered sufficient evidence for its fraud claim to survive dismissal under Rule 56. The Court disagrees.

24. To succeed on a claim for fraud in the inducement, a party must offer proof of (1) a false representation or concealment of a material fact, (2) that is reasonably calculated to deceive, (3) is made with the intent to deceive, (4) does in fact deceive, (5) and results in damage to the injured party. *Tradewinds Airlines, Inc. v. C-S Aviation Servs.*, 222 N.C. App. 834, 840, 733 S.E.2d 162, 168 (2012). MDI-NC's counterclaim for fraud in the inducement fails here because MDI-NC has not forecast evidence that Insight made any misrepresentations of, or concealed, material facts with an intent to deceive MDI-NC.

25. At the core of MDI-NC's fraud claim are MDI-NC's allegations that Insight never intended to purchase MDI-NC's assets and that Insight's initial $2.1 million offer was an erroneous valuation made with reckless disregard for the truth. "While the concept of a statement 'made with reckless indifference as to its truth' . . . [has] been held to satisfy the element of 'false representation,' [that concept does] not

satisfy the element of a statement 'made with intent to deceive.'" *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988).

26.     MDI-NC argues that Insight's deceitful intent is evidenced by "the fact that Insight continued to refuse to disclose its error to MDI-NC." (Defs.' Resp. Opp. Pl.'s Mot. Dismiss and Partial Summ. J. 5.) In support of this theory, MDI-NC relies on a series of e-mails "in which Insight continues to suggest that reimbursement rates for MDI of NC's imaging services had fallen between 2011 and 2013, when in fact the numbers it was reviewing were incorrect due to its own, unilateral error, which [MDI-NC] had no way of independently discovering." (Defs.' Resp. Opp. Pl.'s Mot. Dismiss and Partial Summ. J. 5.)

27.     Those e-mails show that Insight was engaged in a seemingly open conversation with MDI members as part of its due diligence. For instance, prior to discovering Insight's valuation error, McKee inquired about changes in reimbursement rates, explained that he was inquiring because Insight's analyst was attempting to explain a perceived 23% drop in rates, and then requested updated revenue data since February 2011. (Pl.'s Mot. Summ. J. Ex. 12.)

28.     MDI-NC seeks to wring fraudulent intent out of the fact that it was not apprised of Insight's valuation models at an earlier date and therefore lacked the opportunity to correct Insight's mistakes contained therein. That theory, however, lacks any evidence of Insight's willful intent to deceive and defraud MDI-NC. "Fraud is distinguishable from mistake or negligence. Deceit excludes the idea of mistake, and fraud has been termed a grosser species of deceit. . . . Fraud is a malfeasance, a

positive act resulting from a willful intent to deceive[.]" *Davis v. N.C. State Highway Comm'n*, 271 N.C. 405, 408, 156 S.E.2d 685, 687–88 (1967) (citation omitted). Here, MDI-NC acknowledges that Insight erred in its fair value calculations for MDI-NC's assets. Under longstanding principles of North Carolina law, Insight's error is not evidence of Insight's willful intent to deceive and cannot provide the basis for a fraud claim.

29. Likewise, in light of the parties' negotiations, Insight's nondisclosure of the specific nature of its calculation error is not evidence that Insight never intended to purchase MDI-NC for $2.1 million. In particular, there is no evidence that Insight was obligated under the parties' agreements or by operation of law to disclose its various calculations supporting its offer or to complete the asset purchase transaction. Further, MDI-NC's obligations under the Insight MRI Agreement were not conditioned in any way upon either the disclosure of Insight's calculations or the completion of the contemplated transaction. In addition, the language of the LOI made it very clear that the LOI was non-binding, that Insight was not bound to the terms proposed for the asset purchase, (LOI Preamble), and that the final purchase was conditioned upon Insight's satisfactory due diligence. (LOI ¶ 5(b).) Moreover, the LOI expressly stated that the parties made "no obligations whatsoever based on such things as parol evidence, extended negotiations, 'handshakes,' oral understandings, or courses of conduct," (LOI Preamble), and a similar clause was included in the Insight MRI Agreement. (Insight MRI Agreement ¶ 13.)

30.    In sum, the evidence of fraudulent intent proffered by MDI-NC, viewed in the light most favorable to MDI-NC, does not permit a rational factfinder to reasonably conclude that Insight lured MDI-NC to the table with a potential offer it never intended to pay.  As such, MDI-NC's fraud claim is fatally deficient, and the Court grants Insight summary judgment on this claim.

C.  Unfair or Deceptive Trade Practices (MDI-NC's Counterclaim)

31.    MDI-NC also brings a counterclaim against Insight for unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1, premising that claim on the same conduct as its fraud claim.  To succeed on such a claim, a party must show (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) that proximately caused injury to the party or its business.  N.C. Gen. Stat. §§ 75-1.1, 75-16; *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 460–61, 400 S.E.2d 476, 482 (1991).  Fraud in the inducement "necessarily constitutes" an unfair or deceptive trade practice. *Tradewinds Airlines, Inc.*, 222 N.C. at 840, 733 S.E.2d at 169.  However, a claimant may prevail on a section 75-1.1 claim even where a fraud claim fails.

> [O]ur Supreme Court has held that to succeed under G.S. 75-1.1, it is not necessary for the plaintiff to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception, [but the] plaintiff must, nevertheless, show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception.

*Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 452–53, 279 S.E.2d 1, 7 (1981).  "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. . . . [A] practice is deceptive if it has the capacity or tendency to deceive;

proof of actual deception is not required." *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981).

32. Applying this standard here, the Court concludes that MDI-NC has not produced evidence of acts possessing the tendency or capacity to mislead sufficient to permit MDI-NC's section 75-1.1 claim to survive dismissal under Rule 56. In particular, MDI-NC complains that it "received repeated reassurances that Insight intended to purchase its assets for $2.1M while being denied the opportunity to confirm the accuracy of this representation." (Defs.' Resp. Opp. Pl.'s Mot. Dismiss and Partial Summ. J. 7.) MDI-NC is a sophisticated party that was engaged in an arm's length transaction with Insight, and, as detailed above, the documents exchanged throughout the negotiation process expressly noted that the parties were not obligated to close the transaction.

33. The Court cannot conclude, on the evidence of record advanced by MDI-NC here, that the denial of an opportunity to confirm the accuracy of Insight's valuation is somehow unfair or deceptive under section 75-1.1. To the contrary, absent specific agreement between the parties or the limited circumstances in which a duty to disclose arises by operation of law, sellers in an arm's length transaction, such as MDI-NC here, do not typically have a legal right to parse the buyer's offer or examine the buyer's internal calculations or assumptions in making that offer.

34. MDI-NC essentially argues here that Insight had a duty to disclose its valuation of MDI-NC prior to the execution of the Insight MRI Agreement. In an arm's length transaction, a duty to disclose may arise in two discrete scenarios: (1)

when one party takes affirmative steps to conceal material facts from the other; or (2) when one party has knowledge of a latent defect in the subject matter of the transaction about which the other party is ignorant and unable to discover through reasonable diligence. *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 196 (M.D.N.C. 1997) (applying North Carolina law). MDI-NC cannot argue that the details of Insight's valuation are a latent defect that should have been disclosed or a material fact that Insight concealed, because Insight was never in fact obligated to purchase MDI-NC's assets for $2.1 million. *See Caper Corp. v. Wells Fargo Bank, N.A.*, No. 7:12-CV-357-D, 2013 U.S. Dist. LEXIS 119506, at *30 (E.D.N.C. Aug. 22, 2013) (applying North Carolina law) ("Private parties to an arm's-length business transaction have no duty to disclose their potential income or profits to each other."), *aff'd* 578 Fed. Appx. 276 (4th Cir. 2014). Furthermore, the Insight MRI Agreement, as executed, stands alone and makes no reference to the proposed asset purchase as a related transaction, and there is no evidence that the parties ever agreed that MDI-NC would have the opportunity to review and evaluate the calculations and assumptions on which Insight's offer was premised. That MDI-NC was denied the opportunity to scrutinize Insight's valuation does not give rise to a claim under section 75-1.1 on the evidence here.

35. Accordingly, the Court concludes that MDI-NC has failed to offer evidence of unfair or deceptive acts or practices and therefore that summary judgment should be entered for Insight on MDI-NC's counterclaim for unfair or deceptive trade practices under section 75-1.1.

D. Breach of Contract

36.     Insight also moves for summary judgment on its own breach of contract claim against MDI-NC.  MDI-NC opposes summary judgment on this claim only with respect to its affirmative defenses: "While it is undisputed that [MDI-NC] did not comply with all of its payment obligations under the Insight MRI Lease, it has always been [MDI-NC's] position that its failure to meet those obligations was justified under the circumstances."  (Defs.' Resp. Opp. Pl.'s Mot. Dismiss and Partial Summ. J. 7.)

37.     MDI-NC raises several affirmative defenses to the breach of contract claim, all of them based on Insight's reduction in its offer for MDI-NC's assets and the failure of the asset purchase negotiations.[3]  "With regard to an affirmative defense, summary judgment is appropriate if the movant establishes that the non-movant cannot prevail on at least one of the elements in his affirmative defense."  *Bunn Lake Prop. Owner's Ass'n v. Setzer*, 149 N.C. App. 289, 294–95, 560 S.E.2d 576, 580 (2002).

1.  Fraud

38.     MDI-NC's Amended Counterclaims seek rescission of the Insight MRI Agreement as a result of its fraud counterclaim.  (MDI-NC Am. Countercls., Prayer for Relief ¶ 3.)  Fraud in the inducement may be a defense to a breach of contract claim.  *See Matthews v. Price*, 90 N.C. App. 541, 546, 369 S.E.2d 116, 119 (1988).  Because the Court has already concluded that Insight should have summary

---

[3]  Upon the motion of MDI-NC, the Court allowed MDI-NC to file a sur-reply on the issue of its affirmative defenses.  The Court additionally allowed Insight to file a brief response to MDI-NC's sur-reply.

judgment dismissing MDI-NC's fraud counterclaim, MDI-NC's attempt to assert fraud as a defense to Insight's breach of contract claim must fail.

### 2. Equitable Estoppel

39.    MDI-NC's equitable estoppel defense also fails as a matter of law. "Equitable estoppel arises when an individual, by his acts, representations, admissions, or by his silence when he has a duty to speak, intentionally or through culpable negligence induces another to believe that certain facts exist, and such other person rightfully relies and acts upon that belief to his detriment." *Thompson v. Soles*, 299 N.C. 484, 487, 263 S.E.2d 599, 602 (1980). When the "evidence gives rise to only one inference from undisputed facts, then the doctrine of equitable estoppel is a question" of law for the Court to decide on summary judgment. *White v. Consol. Planning, Inc*, 166 N.C. App. 285, 305, 603 S.E.2d 147, 162 (2004).

40.    Furthermore, a party raising an equitable estoppel defense "must have . . . a lack of knowledge and the means of knowledge to the real facts in question." *Id.* This element affirms that "estoppel is not available to protect a party from the consequences of its own negligence." *Syro Steel Co. v. Hubbell Highway Signs, Inc.*, 108 N.C. App. 529, 532–33, 424 S.E.2d 208, 210 (1993).

41.    Defendant Luke has offered testimony that MDI-NC terminated the Alliance lease and entered into the Insight MRI Agreement strictly in reliance on Insight's intent to purchase MDI-NC's assets for $2.1 million: "[MDI-NC] still had a decent relationship with Alliance, and we were still counting on your client, Insight, to complete this deal. Otherwise, we would have never switched out—you know,

switched vendors from Alliance[.]" (Luke Dep. 69:20–24.) Luke also testified that McKee had expressed by e-mail "a requirement that in order for them to get to this point with a letter of intent . . . and pursue or complete the acquisition, they would have to have their own mobile unit in there versus Alliance's." (Luke Dep. 18:17–25.) MDI-NC, however, has produced no evidence of specific facts in support of Luke's testimony.

42. Although Luke testified that he believes McKee sent e-mails describing an MRI lease with Insight as a necessary condition to the asset purchase, MDI-NC has produced no such communications. Moreover, Luke's statement that "we were still counting on [Insight] to complete this deal" does not reflect Insight's agreement as much as MDI-NC's hope concerning the proposed sale. "Such conclusory statements of opinion are not evidence properly considered on a motion for summary judgment." *Estate of Whitaker v. Holyfield*, 144 N.C. App. 295, 302, 547 S.E.2d 853, 858 (2001).

43. The extensive documentary evidence produced by Insight, on the other hand, does show that the MRI Agreement and the asset purchase were regularly identified as distinct transactions. MDI-NC's position is further defeated by a letter to Alliance sent on behalf of MDI-NC in which Luke acknowledges that the proposed asset purchase was being negotiated pursuant to a non-binding LOI and was not guaranteed to close. (Pl.'s Mot. Summ. J. Ex. 27.) Luke sent this letter on August 20, 2012, just one month after entering into the Insight MRI Agreement. MDI-NC has failed, therefore, to present substantial evidence that would create a genuine issue of fact concerning whether Insight induced MDI-NC to believe that it would go

through with the asset purchase if MDI-NC leased an Insight MRI unit. *See DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) ("'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"); *Whitaker*, 144 N.C. App. at 301–02, 547 S.E.2d at 858 (affirming summary judgment and holding that non-movants' statement of opinion in their joint affidavit was insufficient to create a genuine issue of material fact).

44. Furthermore, MDI-NC cannot show that it "lacked knowledge or the means to know" that Insight allegedly did not intend to purchase MDI-NC's assets for $2.1 million. Significantly, MDI-NC cannot claim that it lacked such knowledge because at the time it entered into the Insight MRI Agreement, MDI-NC had actual knowledge that Insight was not in fact obligated to close the proposed asset purchase. The LOI, which was executed one month before the Insight MRI Agreement, explicitly provided that the parties had not yet agreed to be bound to the final transaction. (LOI ¶ 16.) The LOI expressly identified itself as a "non-binding expression of the mutual intent of the parties," which would not "constitute an obligation or commitment of any person or entity to enter into the Definitive Agreements, consummate the Transaction or pay any of the purchase price." (LOI ¶ 16.)

45. The language of the LOI and the Insight MRI Agreement also precludes MDI-NC from arguing that it lacked knowledge or the means to know that Insight would not purchase MDI-NC's assets for $2.1 million. Luke admits that MDI-NC did not seek to memorialize in the LOI the procurement of an Insight MRI unit as a contingency to the asset purchase. (Luke Dep. 19:11–20:8.) In addition, the Insight

MRI Agreement contains a merger clause, which provides that the written MRI lease "supersede[s] all prior . . . representations and understandings of the parties, oral or written," (Insight MRI Agreement ¶ 1), and MDI-NC has not presented evidence that this merger clause should be disregarded. *See Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987) ("North Carolina recognizes the validity of merger clauses and has consistently upheld them.").

46.     The LOI makes no mention of a contingent requirement to lease an Insight MRI unit, and the Insight MRI Agreement makes no mention of the proposed asset purchase. MDI-NC cannot, on the basis of its bare, unsupported allegations, raise as an equitable defense that Insight wrongfully induced MDI-NC to enter into the lease agreement by making its asset purchase offer. The unambiguous language of the written documents ratified by MDI-NC undermine its position and, in the absence of other evidence, prove that MDI-NC cannot prevail on its equitable estoppel defense as a matter of law. *See, e.g.*, *Syro Steel*, 108 N.C. App. 529, 532–33, 424 S.E.2d 208, 210–11 (denying equitable estoppel defense to party who had actual knowledge of unambiguous contract terms). Therefore, the Court grants summary judgment for Insight striking this defense.

### 3.  Unclean Hands

47.     MDI-NC asserts the doctrine of unclean hands as a defense against Insight's breach of contract claim.[4] The doctrine of unclean hands "denies equitable relief only

---

[4]  Insight argues that an unclean hands defense is unavailable to its legal claim for money damages flowing from its breach of contract claim. *See Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F. Supp. 1233, 1234 (M.D.N.C. 1996) (applying North Carolina law and holding that

to litigants who have acted in bad faith, or whose conduct has been dishonest, deceitful, fraudulent, unfair, or overreaching in regard to the transaction in controversy." *Collins v. Davis*, 68 N.C. App. 588, 592, 315 S.E.2d 759, 762 (1984). However, the Court need not find actual fraud to allow an unclean hands defense. *Brissett v. First Mt. Vernon Indus. Loan Ass'n*, 233 N.C. App. 241, 256, 756 S.E.2d 798, 809 (2014).

48.     MDI-NC complains of Insight's conduct with regard to the contemplated asset purchase, but undisputed facts show that the Insight MRI Agreement was a separate transaction and included a merger clause to that effect.   MDI-NC has forecast no specific facts or evidence to show that Insight acted dishonestly, fraudulently, deceitfully, or in bad faith, or that the contemplated transaction was unfair.   Its unclean hands defense therefore fails as a matter of law and must be dismissed.

### 4.   MDI-NC's other defenses

49.     MDI-NC's answer raises other affirmative defenses, which the parties did not discuss in briefing or arguing the Motion for Summary Judgment.   The Court concludes that those affirmative defenses do not preclude the entry of summary judgment on Insight's breach of contract claim.   *See* N.C. R. Civ. P. 56(e) ("[A]n

---

"[t]he defense of unclean hands is applicable only when the plaintiff seeks an equitable remedy."). However, Insight is seeking to pierce the corporate veil, which is an equitable remedy. The Court therefore concludes that MDI-NC's unclean hands defense is properly raised. *See Swan Quarter Farms, Inc. v. Spencer*, 133 N.C. App. 106, 109–10, 514 S.E.2d 737–38 (1999) (upholding trial court's decision not to pierce the corporate veil where claimant acted with unclean hands).

adverse party may not rest upon the mere allegations or denials in his pleading . . . [and] must set forth specific facts showing that there is a genuine issue for trial.").

50.     The Court concludes that there is no genuine issue of material fact as to whether MDI-NC was justified in ceasing to perform its obligations under the Insight MRI Agreement.  Therefore, the Court grants summary judgment to Insight on the issue of MDI-NC's liability on Insight's breach of contract claim.

### 5.  Damages for Breach of Contract

51.     Insight also asks the Court to grant summary judgment in its favor as to damages for MDI-NC's breach of contract.  The calculation of damages is typically a fact-intensive inquiry, but "summary judgment on a claim of damages is appropriate where the moving party sufficiently establishes by competent documents that a liquidated amount is owing him, and the opposing party fails to show facts which dispute that evidence."  *Frank H. Conner Co. v. Spanish Inns Charlotte, Ltd.*, 294 N.C. 661, 678, 242 S.E.2d 785, 795 (1978).  Here, Insight offers the report of its financial expert, Robert J. Taylor, IV ("Taylor"), who will testify that Insight's lost profits, after mitigating its damages, amounted to at least $2,422,522.00.  (Pl's Mot. Summ. J. Conf. Ex. 10 p. 19.)  Insight argues that it is entitled to summary judgment on its contract damages for at least this minimum amount.  The Court disagrees based on the current record.

52.     In particular, MDI-NC has challenged several of Taylor's calculations.  Indeed, in the Motion to Exclude, the parties are locked in a dispute about whether to exclude testimony by Defendants' expert witness, Hodge, that indicates his

disagreement with Taylor's methods and conclusions. For the reasons detailed below, the Court concludes that certain portions of Hodge's purported expert testimony on damages should not be excluded at this time. Accordingly, the Court concludes that factual questions about Taylor's damages calculation remain, and entry of a specific damages award for Plaintiff on its breach of contract claim is not appropriate on this record under Rule 56. The Court may revisit this issue at the proper time before or during trial.[5]

E. Unfair or Deceptive Trade Practices (Insight's Claim)

53. Insight next moves for summary judgment on its section 75-1.1 claim. Insight argues that Luke and Venesky caused MDI-NC to breach its contract with Insight in retaliation for the failed asset purchase deal, and that the two did so while continuing to pay sums to other entities the duo owned. Insight characterizes this alleged conduct as unfair within the meaning of section 75-1.1. (Pl.'s Br. Supp. Mot. Dismiss and Partial Summ. J. p. 25.) Insight also contends MDI-NC represented that it had no money left to pay Insight under the Insight MRI Agreement, but never attempted to verify how much money it had while simultaneously diverting to MDI-NC's sole member, MDI, the $1.5 million made from the asset purchase. Insight argues this alleged conduct constitutes a deceptive act under section 75-1.1. (Pl.'s Br. Supp. Mot. Dismiss and Partial Summ. J. 25.)

54. As this Court has explained in prior cases, an intentional breach of contract, in and of itself, is not "sufficiently unfair or deceptive to sustain an action under

_____

[5] In light of the Court's denial of summary judgment on this issue, the Court need not address at this time MDI-NC's defense based on Insight's alleged failure to mitigate its damages.

[section 75-1.1]. . . . A party must therefore show 'substantial aggravating circumstances' accompanying the breach of contract to sustain its [section 75-1.1] claim." *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *13 (N.C. Super. Ct. Jan. 5, 2016) (quoting *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992)); *see also United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981); *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013). Such aggravating circumstances often include "forged documents, lies, and fraudulent inducements." *Forest2Market*, 2016 NCBC LEXIS 3, at *14 (quoting *Stack v. Abbott Labs., Inc.*, 979 F. Supp. 2d 658, 668 (M.D.N.C. 2013)).

55. The Court concludes that Insight has not advanced undisputed facts showing unfair or deceptive acts, or substantial aggravating circumstances accompanying MDI-NC's breach, requiring entry of judgment for Insight on this claim. For example, although Gentry testified that he never conducted a thorough analysis of the bank account shared by MDI, MDI-NC, and MDI Arizona, he also testified that these LLCs were in such dire financial straits that no investigation was needed to know that Insight could not be paid after MDI-NC's $1.5 million asset sale. (Gentry Dep. 191:2–192:25.) Further, Defendants have forecast some evidence suggesting that the money from MDI-NC's sale of assets was used only to pay MDI-NC's creditors and not to enrich Defendants. Based on its review of the proffered evidence in the light most favorable to Defendants, the Court concludes that summary judgment should not be entered on Plaintiff's section 75-1.1 claim.

F.  <u>Piercing the Corporate Veil</u>

56.    Insight also seeks relief from MDI-NC's sole member, MDI, as well as MDI's members, Luke and Venesky.  As part of its Motion for Summary Judgment, Insight asks the Court to pierce MDI-NC's and MDI's limited liability structures and hold MDI, Luke, and Venesky jointly and severally liable on Insight's claims as a matter of law.

57.    Piercing of the corporate veil "is not a theory of liability. Rather, it provides an avenue to pursue legal claims against corporate officers or directors who would otherwise be shielded by the corporate form." *Green v. Freeman*, 367 N.C. 136, 146, 749 S.E.2d 262, 271 (2013).  In North Carolina, the doctrine of corporate veil piercing is applicable to LLCs. *Estate of Hurst v. Moorehead I, LLC*, 228 N.C. App. 571, 576, 748 S.E.2d 568, 573 (2013).  Members of an LLC are generally given the same benefit of limited liability as corporate shareholders, *id.*, but courts will pierce the legal entity's veil where such action is necessary to prevent fraud or achieve equity.  *See Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985).  Nevertheless, our appellate courts have repeatedly reminded trial courts that piercing the corporate veil "is a strong step:  Like lightning, it is rare [and] severe[.]" *S. Shores Realty Servs. v. Miller*, 2017 N.C. App. LEXIS 28, at *24 (N.C. Ct. App. Jan. 17, 2017) (quoting *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 439, 666 S.E.2d 107, 112 (2008)).

58.    Under North Carolina law, piercing the corporate veil may be appropriate when the corporation is a "mere instrumentality or alter ego" of the dominant actor.

*Hurst*, 228 N.C. App. at 577, 748 S.E.2d at 574. Under the "instrumentality rule," Insight must prove three elements before the Court will disregard MDI-NC's corporate form: (1) complete domination and control by the members "of policy and business practice in respect to the transaction so attacked," such that the controlled LLC has "no separate mind, will or existence of its own"; (2) that such control was "used by the defendant[s] to commit fraud or wrong, to perpetrate the violation" of a legal duty "or a dishonest and unjust act"; and (3) that "[t]he aforesaid control and breach of duty . . . proximately cause[d] the injury or unjust loss complained of." *Glenn*, 313 N.C. at 455, 329 S.E.2d at 330.

59.    Factors that weigh in favor of piercing the corporate veil include:

> 1. Inadequate capitalization ("thin incorporation"). . . .
>
> 2. Non-compliance with corporate formalities. . . .
>
> 3. Complete domination and control of the corporation so that it has no independent identity. . . .
>
> 4. Excessive fragmentation of a single enterprise into separate corporations. . . .

*Id.* at 455, 329 S.E.2d at 330–31 (citations omitted). "These factors may be weighed differently in a case in which the business entity in question is an LLC rather than a corporation." *S. Shores Realty*, 2017 N.C. App. LEXIS 28, at *27–28 (noting that "control" over an LLC is different than control over a corporation, since all LLC members "are statutorily deemed to be managers").

60.    Insight argues that MDI-NC was "a mere instrumentality or alter ego of its sole member, [MDI], which is itself a mere instrumentality or alter ego of Luke and

Venesky." (Pl.'s Br. Supp. Mot. Dismiss and Partial Summ. J. 21.) Thus, Insight argues that Luke and Venesky, and, through them, MDI, used their control of MDI-NC to cause MDI-NC to act contrary to Insight's legal rights under the Insight MRI Agreement. Insight argues that MDI-NC was inadequately capitalized, failed to follow corporate formalities, was completely dominated and controlled by MDI (which in turn was dominated by Luke and Venesky), and was in actuality a fragment of a greater single enterprise run by Luke and Venesky. Defendants contend granting summary judgment on this issue would be improper, as genuine issues of material fact remain unanswered. Examining each factor, the Court agrees with Defendants.

### 1. Inadequate Capitalization

61. With regard to the first piercing factor, Insight alleges MDI-NC and MDI were inadequately capitalized. When examining this factor, a distinction is made between "inadequate capitalization borne out of deception or fraud" and inadequate capitalization arising from a lack of funding. *Cold Springs Ventures, LLC v. Gilead Scis., Inc.*, 2015 NCBC LEXIS 1, at * 25 (N.C. Super. Ct. Jan. 6, 2015) (citing Russell M. Robinson II, *Robinson on North Carolina Corporation Law* § 2.10(b) (7th ed. 2002)). Defendants agree that little money was available to MDI-NC or MDI, but contend both were experiencing genuine financial difficulties. Evidence put forward by Defendants indicates Luke and Venesky made large contributions to the LLCs to keep them afloat during the relevant time periods. (Gentry Dep. 160:14–161:4.) There is no undisputed evidence before the Court that shows a deliberate decision to

undercapitalize either LLC.  At this stage, this factor does not compel veil piercing as a matter of law.

### 2.  Noncompliance with Corporate Formalities

62.    Insight sets forth a great deal of evidence arguing that Defendants failed to respect business formalities.  The forecast evidence tends to show that:  (i) MDI-NC and MDI shared one bank account with several other LLCs and potentially commingled assets; (ii) MDI-NC's Asheville facility was staffed by MDI employees (or employees working for other LLCs controlled by Luke and Venesky) while MDI-NC had no employees of its own; and (iii) MDI-NC and MDI lacked independent company records.  (Taylor Report pp. 10–16.)  Such facts can weigh in favor of piercing.  *See, e.g.*, *Atl. Tobacco Co. v. Honeycutt*, 101 N.C. App. 160, 166–67, 398 S.E.2d 641, 644–45 (1990); *Cold Spring Ventures, LLC*, 2015 NCBC LEXIS 1, at *22–23.

63.    "[N]on-compliance with corporate formalities . . . is of less relevance in the context of an LLC, which is subject to far fewer formal statutory requirements than is a corporation." *S. Shores Realty*, 2017 N.C. App. LEXIS 28, at *29.  *See also* N.C. Gen. Stat. § 57D-10-01 ("The purpose of [the LLC Act] is to provide a flexible framework under which one or more persons may organize and manage one or more businesses as they determine to be appropriate with minimum prescribed formalities or constraints.")

64.    Here, while some of the evidence forecast would weigh in favor of piercing due to a failure to follow formalities, other factors, considered in the light most favorable to Defendants, weigh against piercing.  As previously discussed, LLCs by

their nature require fewer corporate formalities than corporations. While the LLCs shared a common bank account, Defendants have proffered evidence that the individual revenue and expenses of each LLC were individually tracked through the bank account software. (Gentry Dep. 132:25–134:16.) MDI also filed consolidated tax returns that separately identified MDI-NC's income and expenses. This combination of facts, viewed in a light most favorable to Defendants, precludes a finding that piercing is compelled as a matter of law.

### 3. Domination and Control

65. The third factor, complete domination and control, is perhaps the most important when a party seeks to pierce the corporate veil under the instrumentality or alter ego theory. *Cold Spring Ventures, LLC*, 2015 NCBC LEXIS 1, at *17–18. In this case, MDI was the sole member of MDI-NC, and Luke and Venesky held 99% of the membership interests in MDI. Corporations with few shareholders and wholly owned subsidiaries are often those most vulnerable to veil piercing under this factor, for obvious reasons. Robinson, *supra*, §2.10(b). In the context of an LLC, the same is true. *Hurst*, 228 N.C. App. at 576, 748 S.E.2d at 573 (corporate veil piercing applicable to LLCs).

66. Still, close or solo ownership or membership alone does not always equate to complete domination and control and, thus, veil piercing. "In cases arising out of contracts with a close corporation, where another party has voluntarily dealt with the corporation, corporate separateness is usually respected." *Statesville Stained Glass v. T.E. Lane Constr. & Supply Co.*, 110 N.C. App. 592, 597, 430 S.E.2d 437, 440

(1993). Insight's voluntary decision to contract only with MDI-NC—without, say, seeking guarantees from MDI, Luke, Venesky, or Gentry—is a factor that prevents the Court from determining at summary judgment that Luke and Venesky's control over MDI-NC requires piercing the corporate veil as a matter of law.

### 4. Excessive Fragmentation

67. Extensive discussion of the final factor, excessive fragmentation, is not necessary, due to the undetermined nature of the underlying facts explored above. Corporate shareholders and LLC members do not forgo their limited liability simply because they have numerous subsidiaries. *See Richardson v. Bank of Am. N.A.*, 182 N.C. App. 531, 548, 643 S.E.2d 410, 421 (2007) (stating that evidence of the existence of numerous subsidiaries is not sufficient on its own to demonstrate "excessive fragmentation").

68. The Court cannot conclude that excessive fragmentation exists on the undisputed facts here as a matter of law. Luke and Venesky are members of several LLCs, and these LLCs do business with each other, but Defendants have proffered evidence showing these companies serve different business roles in different geographic regions. With competing evidence offered by both sides, the Court cannot conclude, at this time, that equity requires piercing MDI-NC's and MDI's corporate veils as a matter of law. Accordingly, Insight must pursue its veil piercing remedy at trial.

III.

MOTION TO EXCLUDE EXPERT TESTIMONY

69.    Plaintiff's Motion to Exclude asks the Court to exclude the testimony of Defendants' damages expert, Hodge.  Hodge's expert report originally forecast testimony on three topics:  (1) the calculation of MDI-NC's damages, (2) rebuttal of Taylor's damages calculations, and (3) Hodge's own calculation of Insight's damages. Having granted summary judgment on MDI-NC's counterclaims, Hodge's testimony calculating MDI-NC's damages is no longer relevant.  During the briefing of the Motion to Exclude, MDI-NC voluntarily withdrew Hodge's anticipated testimony setting forth his own calculation of Insight's damages.  Thus, Hodge is only expected to testify to rebut Taylor's calculations, and the Court elects not to rule at this time on the admissibility of Hodge's voluntarily withdrawn testimony.

70.    Insight argues that Hodge's testimony should be excluded because (1) his opinions about the Springfield Amendment are not helpful to the jury or contrary to law, and (2) his testimony critiquing Taylor's damages calculation is not reliable under North Carolina Rule of Evidence 702.

A.  Legal Standard

71.    Expert testimony is governed by North Carolina Rule of Evidence 702, which is now "virtually identical to its federal counterpart and follows the *Daubert* standard for admitting expert testimony." *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2016 NCBC LEXIS 100, at *5 (N.C. Super. Ct. Dec. 16, 2016) (citing *State v. McGrady*,

368 N.C. 880, 884, 787 S.E.2d 1, 5 (2016)).  Rule 702 has three main requirements: (1) expert testimony must be based on specialized knowledge that will assist the trier of fact, (2) the expert must be qualified by "knowledge, skill, experience, training, or education,"[6] and (3) the testimony must be reliable.  *McGrady*, 368 N.C. at 889–90, 787 S.E.2d at 8–9; N.C. R. Evid. 702(a).

72.     An expert's testimony is reliable if:

(1) The testimony is based upon sufficient facts or data.

(2) The testimony is the product of reliable principles and methods.

(3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. R. Evid. 702(a)(1)–(3).  The focus of the trial court's inquiry "must be solely . . . [the] principles and methodology" used by the expert, "not the conclusions that they generate."  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 582 (1993).  The trial court is tasked with making the preliminary decision of the testimony's admissibility and has discretion in determining how to address the three prongs of the reliability test. *McGrady*, 368 N.C. at 892–93, 787 S.E.2d at 9–10.  In applying the *Daubert* standard, North Carolina courts may seek guidance from federal case law.  *Id.* at 888, 787 S.E.2d at 8.

B.  Springfield Amendment

73.     With regard to the Springfield Amendment, Hodge is expected to testify that (1) Taylor erred in excluding revenue from the Springfield Amendment as mitigation

---

[6]  MDI-NC does not dispute that Hodge is qualified by his "knowledge, skill, experience, training, or education" under Rule 702(a).

of Insight's damages and (2) that additional mitigating revenue was possible under the Springfield Amendment. Insight argues that none of the revenue from the Springfield Amendment constitutes mitigating revenue because Insight is a lost volume seller and that, even if Insight is not a lost volume seller, Hodge's opinion critiquing the specific amount of the Springfield Amendment's revenue is not "based on specialized knowledge that will assist the trier of fact" as required under Rule 702(a).

74. As an initial matter, the Court determines that Defendants have appropriately raised the question of whether revenues from the Springfield Amendment should mitigate Insight's damages. "A plaintiff has the duty to avoid or minimize the consequences of the defendant's wrong." *Smith v. Martin*, 124 N.C. App. 592, 600, 478 S.E.2d 228, 233 (1996) (citing *Miller v. Miller*, 273 N.C. 228, 239, 160 S.E.2d 65, 73–74 (1968)). "Generally, the reasonableness of mitigation efforts depends upon the facts and circumstances of the particular case and is a jury question except in the clearest of cases." *Id.* Insight argues that the jury should not consider whether the Springfield Amendment is mitigating revenue because Insight is a "lost volume" seller as a matter of law.

75. "A lost volume seller is one who has the capacity to perform the contract which was breached as well as other potential contracts, due to their unlimited resources or production capacity." *Shell Trademark Mgmt. BV v. Ray Thomas Petroleum Co.*, No. 3:07cv163-RJC, 2009 U.S. Dist. LEXIS 59646, at *15–16

(W.D.N.C. July 13, 2009) (quoting *Bill's Coal Co. v. Bd. of Pub. Utils.*, 887 F.2d 242, 245 (10th Cir. 1989) (applying North Carolina law).

> Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract.

*Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. 126, 156 (2003) (quoting Restatement (Second) of Contracts § 347 cmt. f (1981)); *see also* N.C. Gen. Stat. § 25-2-708(2) (setting forth the lost volume seller measure of damages under Article 2 of the UCC).

76.     In support of its argument that it could have serviced both the MDI-NC and the Springfield leases at the same time, Insight offers an affidavit from the financial director of its parent company, who avers that Insight had a nationwide fleet of approximately 115 MRI units, that Insight routinely acquires new machines to meet customer demand, and that Insight could have and would have entered into the Springfield Amendment even in the absence of MDI-NC's breach. (Pl.'s Mot. Exclude Ex. 3.) MDI-NC, however, points to evidence that Insight did not know if it had a Siemens Espree unit available at the time it began negotiation with Springfield, and Insight's process for acquiring a specific unit to fill a lease could be rather belabored and drawn out over an extended period of time. (Defs.' Resp. Opp. Pl.'s Mot. Exclude 7.) Because this is ordinarily a question of fact for the jury, the Court concludes that, on the present record, MDI-NC has forecast evidence from which a reasonable jury

could determine that Insight would not have entered into the Springfield Amendment in the absence of MDI-NC's breach.

77. Thus, in light of the intensive factual inquiry attendant to both Insight's mitigation of damages and its status as a lost volume seller, and on the record presently before it, the Court denies Insight's motion to exclude Hodge's testimony that the Springfield Amendment revenue should mitigate Insight's alleged damages based on Insight's claimed status as a lost volume seller.

78. The Court next addresses Hodge's specific proposed testimony that additional mitigating revenue was available under the Springfield Amendment. (Pl.'s Mot. Exclude Ex. 6 p. 29–30.) If allowed to testify on this point, Hodge is expected to opine that he believed Insight could have secured a more profitable lease with Springfield Hospital than Insight actually did. (Hodge Dep. 239:3–10.) Hodge admitted, however, that he knew nothing about the negotiations between Springfield Hospital and Insight, (Hodge Dep. 239:21–25), and further, he acknowledged that he formed his opinions based solely on the large lease rate difference between the Springfield Amendment and the Insight MRI Agreement as well as Insight's representation that Espree MRIs were in high demand. (Hodge Dep. 240:19–241:4.)

79. The Court concludes that this testimony is not based upon Hodge's specialized knowledge and is not helpful to the jury, who could draw this conclusion from these facts just as easily as Hodge. As a result, the Court concludes, in the exercise of its discretion, that Hodge's opinions regarding additional mitigating revenue under, or the unreasonableness of the amount of revenue under, the

Springfield Amendment are inadmissible based on the current record. N.C. R. Evid. 702(a); *Braswell v. Braswell*, 330 N.C. 363, 377, 410 S.E.2d 897, 905 (1991) ("When the jury is in as good a position as the expert to determine an issue, the expert's testimony is properly excludable because it is not helpful to the jury.").

C. Reliability Test Under Daubert

80. The Court next addresses Insight's claim that Hodge's proposed testimony fails the three-pronged reliability test set forth in N.C. R. Evid. 702(a).

1. Sufficient Facts.

81. First, to be reliable, an expert's testimony must be based on sufficient facts or data. Here, the factual basis for Hodge's proffered opinion is first and foremost the data contained in Insight's expert's report. These are the same facts Insight and Taylor rely upon. Insight's argument that Hodge did not correctly understand this data or made improper assumptions during his review of Taylor's report goes to the weight and believability of Hodge's final conclusion, not to the factual basis of his review.

2. Reliable Methodology.

82. Second, an expert's opinion must be based on reliable methods. Insight asserts that Hodge's testimony should be excluded because his criticism of Taylor's report is linked to his own calculation of damages, which Insight contends was unreliable and Defendants no longer intend to introduce.

83. The practice of retaining an expert to criticize an opposing party's expert's conclusions is widespread. Many federal district courts applying the *Daubert*

standard allow rebuttal experts—experts retained to identify flaws in an opposing expert's methodology or conclusions—to base their criticisms of an opposing expert's methodologies on their own experience, without requiring they give their own, alternative opinions. *See, e.g., Nature's Prods. v. Natrol, Inc.*, No. 11-62409, 2013 U.S. Dist. LEXIS 185676, at *20–21 (S.D. Fla. Oct. 7, 2013) (finding a rebuttal expert's methodology reliable under *Daubert* when he drew upon his own knowledge and experience to rebut the conclusions of an opposing expert); *Aviva Sports, Inc. v. Fingerhut Direct Mktg.* 829 F. Supp. 2d 802, 834–35 (D. Minn. 2011) (finding rebuttal experts' testimony admissible when the rebuttal experts applied their expertise to the facts and methodologies used by plaintiff's experts); *Coquina Invs. v. Rothstein*, No. 10-60786-Civ., 2011 U.S. Dist. LEXIS 120267, at *5 (S.D. Fla. Oct. 18, 2011) ("A rebuttal expert can testify as to the flaws that she believe[s] are inherent in another expert's report[.]"); *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-Civ., 2011 U.S. Dist. LEXIS 62969, at *16 (S.D. Fla. June 7, 2011) (finding a rebuttal expert's testimony critiquing an opposing expert's methodology was "sufficiently grounded on her expertise" and thus admissible); *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 481 (E.D.N.Y. 2011) (allowing a rebuttal expert to critique the reliability of an opposing expert's opinion based upon the rebuttal expert's experience); *1st Source Bank v. First Res. Fed. Credit Union*, 167 F.R.D. 61, 65 (N.D. Ind. 1996) ("[A] rebuttal expert witness . . . may criticize [plaintiff's] damages theories and calculations without offering alternatives."); *Boles v. United States*, No. 1:13CV489, 2015 U.S. Dist. LEXIS 42332, at *5 (M.D.N.C. Apr. 1, 2015) (stating that

the proper scope of rebuttal expert testimony is attacking the adversary expert's theories).

84.     Using the discretion afforded to it when addressing reliability, the Court believes the approach discussed above is appropriate in this case. Hodge, in testifying solely to criticize Taylor's opinions, is not expected to put forward alternative conclusions. He is thus not relying on a methodology of his own, but rather using his expertise to criticize Taylor's methodology.

85.     Insight also challenges Hodge's opinion due to his inability to cite specific published authority supporting his critiques, arguing that this, too, shows his testimony is speculative and unreliable. The *Daubert* standard, however, does not require that every expert's opinion be buttressed by published authority. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007) ("[W]e do not suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions."); *Bonner v. ISP Techs., Inc.* 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)) ("[T]here is no requirement 'that a medical expert must always cite published studies . . . in order to reliably conclude a particular object caused a particular illness.'"); *Fed. Deposit Ins. Corp. v. Suna Assocs., Inc.*, 80 F.3d 681, 687 (2d Cir. 1996) (holding a lack of textual support goes to the weight of an expert's opinion, not to that opinion's admissibility). In this case, the Court does not believe Hodge's inability to cite specific textual authority supporting his critiques leads to the conclusion that his testimony is unreliable, especially in light of his limited function as a rebuttal expert.

86. The Court further finds that Hodge is sufficiently qualified to critique Taylor's methodology as a rebuttal expert. At his deposition, Hodge identified himself as a CPA accredited in business valuation and certified in financial forensics. (Hodge Dep. 22:11–23:23.) Moreover, Hodge has given specific reasons for his criticisms, such as Taylor's inability to account for economic cycles using a one-year "track record." (Hodge Dep. 107:3–20.) While acknowledging that Taylor's approach to modeling was not inherently inaccurate and largely a matter of professional judgment, Hodge also used his experience to point out parts of Taylor's report he believed were erroneous or could have led to inaccurate conclusions.

87. Based on the record before it, the Court believes Hodge can serve as a rebuttal expert under these circumstances. As such, the Court finds, in the exercise of its discretion, that Hodge's testimony satisfies the second prong of the reliability test.

### 3. Application of Methodology to Facts.

88. Finally, an expert must have reliably applied a dependable methodology to the facts of the specific case at hand. Insight here again takes issue with Hodge's understanding of the facts used to compile Taylor's report, arguing that his misunderstanding and lack of contextual knowledge about Insight's business means Hodge could not have reliably applied an appropriate methodology to the facts of this case.

89. Courts following the *Daubert* standard in these situations typically conclude such challenges go to the weight of an expert's opinion, not its admissibility. *See*

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (holding that contentions a damages expert made improper calculations or erroneous factual assumptions went to the weight of the testimony, not its admissibility); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of . . . accuracy (above this minimum threshold) go to the testimony's weight, but not its admissibility."); *Pandora Jewelers 1995, Inc.*, 2011 U.S. Dist. LEXIS 62969, at *23 ("[W]eaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility."); *Martinez v. Porta*, 598 F. Supp. 2d 807, 812 (N.D. Tex. 2009) (holding plaintiff's argument went to weight, not admissibility, when plaintiff argued an expert's conclusions were erroneous and "based on an 'analytical gap.'"). Insight's argument questions the soundness of Hodge's opinion, rather than the validity of his process. These contentions go to the testimony's weight, and can be explored during cross-examination at trial without foreclosing Defendants' ability to use their own expert witness to question Taylor's conclusions.

90. Based on the current state of the record, and in the exercise of its discretion, the Court cannot agree that Hodge's testimony concerning the accuracy of Taylor's profit projections, the replacement scanner cost, and Insight's mitigation of damages through the Springfield Amendment is unreliable under the *Daubert* standard. The Court's ruling, however, is without prejudice to Insight's right to renew the motion as the record develops at trial.

91. The Court therefore grants in part and denies in part the Motion to Exclude, with the understanding that all of its rulings on a motion seeking pretrial determination of the admissibility of evidence are subject to modification during the course of the trial. *Hamilton v. Thomasville Med. Assocs.*, 187 N.C. App. 789, 792, 654 S.E.2d 708, 710 (2007).

IV.

CONCLUSION

92. For the foregoing reasons, the Court hereby **ORDERS** as follows:

  a. The Court **GRANTS** Plaintiff's Motion for Summary Judgment and **DISMISSES** Defendant MDI-NC's Counterclaim for fraud in the inducement with prejudice.

  b. The Court **GRANTS** Plaintiff's Motion for Summary Judgment and **DISMISSES** Defendant MDI-NC's Counterclaim for unfair or deceptive trade practices under section 75-1.1 with prejudice.

  c. The Court **GRANTS in part** Plaintiff's Motion for Summary Judgment on MDI-NC's liability on Plaintiff's breach of contract claim and **DENIES in part** Plaintiff's Motion for Summary Judgment on the issue of damages to be awarded on Plaintiff's breach of contract claim.

  d. The Court **DENIES** Plaintiff's Motion for Summary Judgment with regard to Plaintiff's claim for unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1.

e. The Court **DENIES** Plaintiff's Motion for Summary Judgment with regard to Plaintiff's veil piercing demand.

f. The Court **GRANTS in part** the Motion to Exclude as to Hodge's testimony regarding additional mitigating revenue, or the unreasonableness of the amount of revenue, under the Springfield Amendment.

g. The Court **DENIES in part** Plaintiff's Motion to Exclude as to Hodge's testimony regarding the accuracy of Taylor's profit projections, the replacement scanner cost, and the Springfield Amendment as mitigation.

93. Plaintiff's following claims and remedies shall proceed to trial: (1) breach of contract as to damages, (2) fraudulent transfer, (3) unfair or deceptive trade practices, (4) wrongful distribution and personal liability, (5) breach of fiduciary duty, (6) constructive fraud, and (7) piercing the corporate veil.

94. As set forth above, each of Defendants' Counterclaims are dismissed with prejudice, and none shall proceed to trial.

95. The Court will notice a status conference by separate order for the purpose of setting a pretrial and trial calendar.

**SO ORDERED**, this the 24th day of February, 2017.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases